In the

# United States Court of Appeals
## For the Seventh Circuit

No. 00-3791

ROBERT LEE HOLLEMAN,

Petitioner-Appellant,

v.

ZETTIE COTTON,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 95-C-123—**Robert L. Miller, Jr.**, *Judge*.

SUBMITTED SEPTEMBER 13, 2001[*]—DECIDED AUGUST 19, 2002

Before CUDAHY, EASTERBROOK and ROVNER, *Circuit Judges*.

CUDAHY, *Circuit Judge*. In this successive appeal, Robert Holleman argues that the district court erred in concluding that he could not demonstrate cause and prejudice with respect to his ineffective assistance of counsel claims so as to survive a dismissal of his second petition under 28 U.S.C. § 2254 as an abuse of the writ. We affirm.

---

[*] After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R. App. P. 34(a)(2).

**I.**

Holleman was one of four people charged with the murder of Robin Opfer in 1977. *Holleman v. Miller*, 101 F. Supp. 2d 700, 701 (N.D. Ind. 2000). Prior to his indictment for the murder, Holleman had made some incriminating statements to the police, but his statements also implicated Frank Love as the shooter. *Holleman v. Duckworth*, 155 F.3d 906, 908 (7th Cir. 1998). The trial judge, Lake County Superior Court Judge James Clement initially appointed Stanley Jablonski to represent Holleman. *Holleman*, 101 F. Supp. 2d at 701. When a disagreement arose between Holleman and Jablonski, Judge Clement allowed Jablonski to withdraw and appointed James Frank to represent Holleman. *Id.* at 702. Frank had earlier represented co-defendant Love in a separate trial. *Id.* at 701. The district court found that Frank was chosen because he was familiar with the case and Holleman had filed a speedy trial motion. *Id.* at 702. Before appointing Frank to represent Holleman, Judge Clement prudently asked Frank whether there would be any conflict if Frank represented Holleman, and Frank stated that he saw none. *Id.* at 702. This inquiry occurred outside of Holleman's presence, at a hearing unrelated to his case. *Id.*

Frank was available to represent Holleman because he had been successful in persuading the prosecutor to dismiss the murder charges against Love. The prosecutor had dismissed those charges without prejudice based upon insufficient evidence; Frank had persuaded the prosecutor that Love was elsewhere (in South Bend) at the time that Holleman had said Love was shooting Opfer. *Id.* As part of an alibi defense in the Love trial, Frank had notified the prosecutor that he would call Mary Schaar to testify in support of Love's alibi. *Id.*

During Holleman's trial, the prosecutor called the same Mary Schaar as a surprise witness, apparently to cast doubt on Holleman's statements attributing the shooting

to Love. *Id.* Frank unsuccessfully objected to the Schaar testimony on grounds of relevancy, but he did not cross-examine Schaar. *Id.* Later, Frank admitted that he did not cross-examine Schaar to impeach her credibility because he feared that that course could lead to the prosecution's re-instituting the charges against Love. *Id.*

Holleman was acquitted of first degree murder but he was convicted of felony murder. He was sentenced to life imprisonment. *Holleman*, 155 F.3d at 908. This outcome suggests that the jury was not persuaded by the efforts of the state to picture Holleman as the shooter instead of Love (whom Holleman had fingered as the shooter).

After exhausting his direct appeal and state post-conviction procedures in 1981, Holleman filed an application for federal collateral relief pursuant to 28 U.S.C. § 2254, but did not raise a claim of ineffective assistance of counsel in that petition. That petition was denied, and this Court affirmed the denial. *Holleman v. Duckworth*, 700 F.2d 391 (7th Cir. 1983). Subsequently, Jeffery Evans was assigned to be Holleman's new appellate counsel. After a diligent search, Evans located Frank (who had been disbarred at that point) and got Frank to admit that Frank had an actual conflict of interest that adversely affected his performance during Holleman's trial.

On February 21, 1995, Holleman filed a second habeas petition, in which he raised two claims (among others). First, he argued that the trial court failed to make a proper inquiry into whether Frank had a conflict of interest—the "judicial inquiry" claim. *See Holloway v. Arkansas*, 435 U.S. 475, 483-84 (1977) (holding that a trial court must inquire into the propriety of multiple representation where one party makes a timely objection); *Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980) (holding that a trial court needs to initiate an inquiry only if it knows or reasonably should know that a particular conflict exists). Second, he argued that Frank's conflict of interest precluded Frank

from providing effective assistance of counsel—the "attorney conflict" claim. *See Cuyler*, 446 U.S. at 350 (holding that an actual conflict of interest that adversely affects defense counsel's performance is a violation of the Sixth Amendment). The state objected that Holleman failed to raise these claims in his first petition, so Holleman's second petition should be dismissed as an abuse of the writ unless Holleman could show cause and prejudice. *See McCleskey v. Zant*, 499 U.S. 467, 494 (1991).

On May 31, 1995, the district court denied the petition as an abuse of the writ. On September 15, 1998, we vacated the district court's order and remanded for an evidentiary hearing to determine whether Holleman could demonstrate cause and prejudice. *Holleman*, 155 F.3d at 911-12 ("Accordingly, we remand the case for an evidentiary hearing to establish what the petitioner knew about the claim, when he knew it, and the earliest he reasonably could have known it."). We held that the record before us did not establish that Holleman knew of the attorney conflict or about the trial judge's knowledge of a potential conflict of interest. *Id.* at 910-11. Further, the record did not "establish as a matter of law whether what Holleman did not know but could have 'discovered upon reasonable investigation' would have supported a claim for relief." *Id.* at 911 (quoting *McCleskey*, 499 U.S. at 498).[1] Therefore, we remanded the case to a different judge for an evidentiary hearing to determine whether Holleman "could have

---

[1] The discussion in *Holleman*, 155 F.3d 906 (7th Cir. 1998), is directed primarily to the question whether Holleman knew enough about the conflicts claims to have brought those claims in his first habeas petition, rather than entirely to the question whether he knew enough to have a duty of further inquiry. This may account for any apparent differences in evaluating some of the evidence between that opinion and this one. Also the present opinion speaks to the findings of a district judge after a full evidentiary hearing.

discovered through reasonable diligence and investigation a conflict of interest claim." *Id.* (internal citation and quotations omitted). Further, we held that Holleman must also demonstrate prejudice to overcome the abuse-of-the-writ defense. *Id.* We indicated that the record before us suggested that the state trial judge knew or should have known of the possibility of a conflict of interest such that the trial judge should have made an adequate inquiry into the conflict. *Id.*

An evidentiary hearing was conducted on May 25, 2000. After that hearing, the district court denied Holleman's second petition as an abuse of the writ. *Holleman*, 101 F. Supp. 2d at 706. The district court found that the trial judge did not know, and could not have known, about the conflict. *Id.* at 704-5. The district court thus concluded that Holleman could not show prejudice with respect to his judicial inquiry claim. *Id.* at 705. The district court also found that Holleman could have raised the judicial inquiry claim in his first petition, but that he inexcusably failed to do so. *Id.* at 705. Further, the district court found that Holleman had reason to inquire into the attorney conflict claim, and that if he had inquired, he would have been told of the conflict by Frank. *Id.* at 706. Thus, the district court concluded that Holleman could not show cause with respect to either claim. *Id.* Holleman appeals.

## II.

This court has jurisdiction under 28 U.S.C. § 1921. We review issues of law de novo, and issues of fact, for clear error. *See Dixon v. Snyder*, 266 F.3d 693, 700 (7th Cir. 2001). A factual finding is clearly erroneous when, after reviewing the complete record, we are left with "the definite and firm conviction that a mistake has been committed." *Thornton v. Brown*, 47 F.3d 194, 196 (7th Cir. 1995). However, in habeas corpus proceedings, mixed questions

of law and fact are reviewed de novo. *See Cuyler v. Sullivan*, 446 U.S. 335, 342 (1980); *Strickland v. Washington*, 466 U.S. 668, 698 (1977) (same).

## III.

"The doctrines of procedural default and abuse-of-the-writ are both designed to lessen the injury to a State that results through reexamination of a state conviction on a ground that the State did not have an opportunity to address at a prior, appropriate time; and both doctrines seek to vindicate the State's interest in the finality of its criminal judgments." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991). The cause and prejudice standard in an abuse-of-the-writ case is the same as in a procedural default case. *Id.* at 494-95. "The standard is an objective one." *Id.* at 495. Holleman can show cause if he can demonstrate that he did not know, and could not have discovered after reasonable investigation, facts sufficient to raise the claim in his first petition. *Id.* at 499. Holleman can show prejudice as to the attorney conflict claim if he can demonstrate that an actual conflict adversely affected the performance of his trial counsel and as to the judicial inquiry claim if the claim could have succeeded. *See Cuyler v. Sullivan*, 446 U.S. 335, 348-349 (1980) (counsel's conflict of interest); *Mickens v. Taylor*, ___ U.S. ___, 122 S. Ct. 1237, 1244 (2002) (trial court's failure to inquire).

We affirm the dismissal of Holleman's second petition because Holleman cannot demonstrate *both* cause *and* prejudice to meet the abuse-of-writ objection as to either claim. While he may be able to demonstrate cause with respect to his judicial inquiry claim, he cannot demonstrate prejudice with respect to that claim. Holleman cannot show prejudice from the judicial inquiry claim because the claim would not have succeeded since the trial judge never had a duty to inquire more deeply than he

did into Frank's conflict. The reverse is true with respect to Holleman's attorney conflict claim. He can demonstrate prejudice with respect to that claim, but he cannot demonstrate cause for failing to raise that claim in his first petition. Holleman cannot demonstrate cause because he failed to ask Frank whether Frank had been burdened by a conflict (or to make an inquiry of another equally plausible source). If Frank had enlightened Holleman as to the conflict, Holleman could have brought his claim based on this information. If Frank had denied the existence of a conflict, Holleman would have established cause (by an external impediment) for not including the attorney conflict claim.

## A.

Under *Holloway* and *Cuyler*, a trial court has the duty to inquire adequately into a trial counsel's conflict of interest if it knows or reasonably should know that a particular conflict exists. *See Holloway*, 435 U.S. at 483-84 (establishing duty); *Cuyler*, 446 U.S. at 347 (holding that a trial court must make an inquiry if it knows or reasonably should know that a particular conflict exists). However, "[a]bsent special circumstances, . . . trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." *Cuyler*, 446 U.S. at 346. While the Supreme Court recently has cast doubt on whether the principle of *Cuyler v. Sullivan* should be applied to cases where trial judges have failed to inquire into conflicts of interest in successive representation cases, *see Mickens*, 122 S. Ct. at 1245, even if *Cuyler* applied in the present case, Holleman cannot show prejudice with respect to his judicial inquiry claim.

Here, the trial court's duty to inquire could be triggered in two situations—before Holleman's trial and during

his trial. The district court found that Holleman could not show cause and prejudice in either situation. Although it is a close question, we believe that Holleman could demonstrate cause for his failure to raise the judicial inquiry claim in his first petition. Unbeknownst to Holleman or to any of his appellate counsel (because it was not in the trial record), Judge Clement had asked Frank whether Frank would have a conflict of interest if he were appointed to represent Holleman. *Holleman*, 101 F. Supp. 2d at 702. Frank had answered that he saw no conflict. *Id.* Had Holleman known of this inquiry, he likely would have raised a judicial inquiry claim (relating to what Judge Clement knew *before* trial) in his first petition. Further, if Holleman had known about the trial court's inquiry, he likely would have brought a judicial inquiry claim based upon the trial court's failure to make an inquiry when Frank developed an actual conflict of interest *during* the trial. However, Holleman cannot demonstrate prejudice because even if he had raised the judicial inquiry claim in his first petition, the claim would have failed because the trial court had no further duty to inquire either before or during Holleman's trial. *But cf. Mickens*, 122 S. Ct. at 1244 ("[T]he rule applied when the trial judge is not aware of the conflict (and thus not obligated to inquire) is that prejudice will be presumed only if the conflict has significantly affected counsel's performance.").

Holleman argues that Judge Clement's inquiry of Frank demonstrated that Judge Clement knew that there was a potential conflict of interest prior to trial (and thus had a duty to inquire into the conflict), or alternatively, Judge Clement should have become aware of the conflict during the trial. Although the circumstances are somewhat clouded, neither argument is compelling.

While "a possible conflict inheres in almost every instance of multiple representation," multiple representa-

tion in itself does not violate the Sixth Amendment. *Cuyler*, 446 U.S. at 346. There were no "special circumstances" in this case that indicated to Judge Clement that he should have conducted a more searching inquiry. *Id.* at 346-47. First, no party objected to the multiple representation. Second, "the provision of separate trials for [the petitioner] and his codefendants significantly reduced the potential for a divergence in their interests." *Id.* at 347. Thus, Judge Clement did not have to conduct a more searching inquiry (although he was certainly not precluded from making such an inquiry). The fact that Judge Clement did inquire does not mean that Judge Clement knew of a potential conflict of interest. If there were an inference of a conflict of interest whenever a trial court initiates such an inquiry, this could discourage judges from making such inquiries. *See Cuyler*, 446 U.S. at 346 n.10 (stating that it was desirable to require trial courts to inquire into conflict of interest claims). Discouraging trial judges from making such inquiries is particularly indefensible in cases, such as the case before us, where the trial judge is the one appointing defense counsel. *Cf. Mickens v. Taylor*, ___ U.S. ___, 122 S. Ct. 1237, 1251 (2002) (Stevens, J., dissenting) (arguing that the need for a thorough inquiry is greater when the trial judge appoints the lawyer).

Further, Judge Clement's question to Frank could be considered an adequate inquiry into any potential conflict of interest. After Frank stated that he saw no conflict of interest, there was no other evidence of conflict for Judge Clement to pursue. Judge Clement could reasonably rely on Frank's representation because (besides the presumption that attorneys make truthful representations to the court) the district court found that Frank reasonably believed that there was no conflict of interest. *Holleman*, 101 F. Supp. 2d at 704-5. Frank had no reason to anticipate that the state would call Schaar as a prosecu-

tion witness in Holleman's trial, a development that entangled Frank in a conflict. The finding about Frank's reasonable belief is not clearly erroneous and is supported by the record. Thus, Judge Clement did not know, and could not have known, about a potential conflict of interest on the part of Frank prior to the trial. Therefore, the trial court did not have a duty to inquire, beyond the question that it posed to the lawyer it was appointing, into a conflict of interest before trial.

But should Judge Clement have known about the conflict *during* the trial? Holleman argues that, since Judge Clement knew that Love had planned to present an alibi defense, when one of Love's alibi witnesses was called in Holleman's trial, Judge Clement should have known at that time that this would create a conflict between Frank's obligation to Love and Frank's obligation to Holleman. The district court, however, found that Judge Clement did not and could not realize the importance of Mary Schaar. *Holleman*, 101 F. Supp. 2d at 705. This finding is not clearly erroneous, and is supported by the fact that Holleman's own appellate counsel, Jeffery Evans (who was searching for ineffective assistance of counsel claims), could not find a conflict of interest claim based on trial developments when he examined the trial transcript. Thus, the trial judge did not have a duty to inquire into Frank's conflict of interest during the trial because he did not know, nor could he reasonably know, that Frank had a conflict. Therefore, Holleman cannot show prejudice with respect to his judicial inquiry claim.

**B.**

Holleman's attorney conflict claim—that Frank had an actual conflict of interest that adversely affected the outcome of the trial—also must be dismissed because Holleman cannot demonstrate cause for his failure to raise

the claim in his first petition. To show cause, the petitioner must show that some "external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991). The district court found that there was no such external impediment that prevented Holleman from learning about Frank's conflict of interest. *Holleman*, 101 F. Supp. 2d at 706.

First, the district court found that Holleman had reason to inquire. *Id.* Further, the district court found that, although Frank was hard to locate when Evans became Holleman's lawyer, "the record allows no inference that Mr. Frank would have been difficult to locate in 1980 or 1981." *Id.* The district court also found that Frank would have revealed his conflict to Holleman if he had been asked. *Id.* It concluded that Frank's instruction to Holleman not to write to Frank about theories for appeal was not "an external impediment preventing the inquiry from being made." *Id.* Thus, Holleman could not establish cause. *Id.*

The district court's finding that Holleman had reason to inquire into the conflict apparently rests upon the fact that Holleman was suspicious about Frank's multiple representation. Holleman raised his suspicion with his appellate counsel as early as 1977, and continued to be suspicious throughout the state and federal appellate processes. Within months of his sentencing, Holleman wrote a letter to his appellate counsel, Dennis Kramer, saying that he thought there was something wrong in Frank's having represented him after representing Love. Kramer wrote back that, "you [Holleman] believe your attorney, James Frank, was competent except for having represented Frank Love earlier." Holleman's suspicions were still alive ten years later when Holleman commented to Evans, his then appellate counsel, "You

may want to look into this. This lawyer [Frank] that represented me also represented my co-defendant."

Holleman's suspicion would have been insufficient to itself form the basis for a conflict claim in Holleman's first petition because, among other things, multiple representation is insufficient in itself to be a factual predicate for a conflict claim. *Cuyler*, 446 U.S. at 706. But is Holleman's suspicion sufficient to require him to initiate an inquiry? Or does Frank's silence with respect to whether he had a conflict absolve Holleman from conducting such an inquiry? What facts and circumstances must be present to *require* a petitioner to inquire into a specific basis for a claim, such as ineffective assistance of counsel (based on a conflict of interest)? Our principal difference with the dissent seems to revolve around this issue. Courts such as the Court of Appeals for the Fourth Circuit in *Mickens v. Taylor*, 240 F.3d 348 (4th Cir. 2001), *aff'd*, 122 S. Ct. 1237 (2002), have apparently assumed that a petitioner has such a duty, but have provided little analysis of the question.

*Mickens* involved an attorney, Saunders, who had previously represented a juvenile that his present client, Mickens, was accused of killing. *Mickens*, 240 F.3d at 354. Saunders had not revealed his prior representation to Mickens. *Id.* Mickens did not raise a claim for ineffective assistance of counsel in his state habeas petition based upon the conflict. When he filed a petition for federal habeas relief based on the conflict, the district court held that Mickens could show cause to overcome his state procedural default because "Saunders' silence *and* state law requirements for secrecy of juvenile court records operated *together* to preclude Mickens from raising the conflict of interest claims in his state habeas petition." *Id.* at 356 (internal citation and quotation omitted) (emphases added). The implication from this statement seems to be that, if the only factor standing in the way of Mickens'

knowing about the conflict of interest was the silence of the conflicted attorney, Mickens would have had to make inquiry. The Court of Appeals for the Fourth Circuit agreed with the district court's conclusion that "the factual predicate for [the conflicts claim] was not available to Mickens in state court nor was it discoverable through the exercise of diligent investigation." *Id. Mickens* thus implies that, if an inquiry would have revealed the factual predicate for a claim and a petitioner has not made such an inquiry, the petitioner would not have been able to show cause. The juvenile confidentiality laws can be a factor in a petitioner's showing cause only if the petitioner had a duty to inquire, but the confidentiality laws made such an inquiry futile. Thus, *Mickens*'s holding must be based upon a principle that the petitioner must inquire into the possibility of a conflict even if his attorney is silent.

Requiring Holleman to initiate an inquiry despite Frank's silence may appear over-demanding, particularly since we have suggested that Judge Clement did not have to initiate an inquiry into a possible conflict of interest in the face of Frank's silence. However, we must examine the facts carefully. Judge Clement *did* ask the same question of the counsel he was appointing (Frank) that we are requiring Holleman to ask (of Frank). Judge Clement was reassured by Frank's response and did not pursue the matter further. Presumably, had Holleman received a similar response, cause would likely have been established.

In any event, before seeking to balance a trial court's duty to inquire with a habeas petitioner's duty to inquire, we must compare the purposes underlying their respective inquiries into attorney conflicts. A trial court's duty to inquire is geared toward the management of an ongoing trial and must be viewed in that context. The purpose of the trial judge's inquiry is to ensure that the defendant is receiving a fair trial. If the trial judge is not put on notice that there is a potential conflict, he is under no duty

to ferret out all the possible conflicts that might arise in a multiple representation situation. His obligation to inquire, however, may be more serious if he is the one appointing the lawyer in question to represent a criminal defendant.

In contrast, the petitioner's duty to inquire into conflict claims is a duty to research historical facts that could form the basis for habeas claims. "[The] [a]buse-of-the-writ doctrine examines *petitioner's* conduct: The question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process. The requirement of cause in the abuse-of-the-writ context is based upon the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." *McCleskey v. Zant*, 499 U.S. 467, 498 (1991) (internal citations omitted) (emphasis in original). The importance of the petitioner's initiative is central to this formulation.[2]

---

[2] The dissent makes much of our alleged assignment of a heavier obligation of inquiry to an uninstructed layman, Holleman, than to a trained jurist, Judge Clement. We cannot say which of these has the weightier duty—only that their respective duties arise in different contexts and with a different perspective on the surrounding facts and events. For example, Judge Clement may have a number of cases on trial with a retinue of witnesses and possibly more than one situation carrying within it the seeds of a conflict of interest. Holleman, on the other hand, has only his own case, in which he has an intense interest, to attend to, and this probably makes up in practical opportunity for scrutiny what he may lack in theoretical insight. It is really not unreasonable to impose on him some obligation of inquiry into matters that have aroused his suspicion.

Thus, Holleman had a duty to initiate an inquiry into all relevant claims. One of those relevant claims is the conflict of interest claim. And multiple representation easily may lead to a conflict of interest claim. The Supreme Court itself had recognized that possible conflicts inhere "in almost all instances of multiple representation." *Mickens*, 122 S. Ct. at 1242. Holleman himself persisted in the belief that there was something suspicious about the multiple representation in his case. After being informed about the multiple representation, Evans had uncovered the actual conflict because Evans believed that there should have been a waiver of any possible conflict arising from the multiple representation. Deposition of Jeffery Evans (May 1, 2000), p. 11, at 22-23. Thus, Holleman, based on the existence of multiple representation coupled with his own persistent suspicion, should have pursued the conflict of interest claim. While Holleman might eventually conclude that there was no basis for such a claim (and he would be correct if the only fact he learned after a "reasonable and diligent investigation" was that Frank had represented Love), he was under a duty to make at least minimal inquiries.

The extent of a petitioner's required inquiry depends upon whether there are "external impediment[s], whether [they] be governmental interference or the reasonable unavailability of the factual basis for the claim, [that] prevent[ ] petitioner from raising the claim." *McCleskey,* 499 U.S. at 493. A petitioner could show cause if he could demonstrate either that an inquiry would have been futile because of an external impediment or that he had conducted a "reasonable and diligent investigation" in light of any external impediments. A petitioner could show that an inquiry would be futile if he would not have been able to discover the factual predicate for his conflict claim even if he had inquired. *Cf. Mickens*, 240 F.3d at 356 (holding that petitioner demonstrated cause be-

cause state juvenile confidentiality law prevented petitioner from discovering that his attorney had represented petitioner's murder victim even if he had inquired). Alternatively, the petitioner could show that he had conducted "a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition," *McCleskey*, 499 U.S. at 498, if he had pursued all reasonable avenues of investigation. For example, if the petitioner had asked his attorney about conflicts of interest, and the attorney simply had said that he was under no conflict, this inaccurate response could constitute an external impediment to acquiring enough information to make a conflict claim.

Here, Holleman cannot show cause in either of the ways noted in the caselaw. Holleman never made an inquiry into the conflict claim. Thus, he cannot be said to have conducted "a reasonable and diligent investigation." However, on this issue, Holleman argues that he did satisfy the diligence requirement when he sent two letters to Frank asking him about theories of appeal, and Frank told Holleman to discuss such issues with his appellate counsel. But, of course, Holleman's inquiry was not specific to conflicts of interest, and Frank's advisement did not preclude Holleman from inquiring specifically about conflicts of interest when he was preparing his first federal collateral appeal.

Holleman also contends that an inquiry would have been futile despite the district court's finding that Frank would have revealed his conflict to Holleman if Holleman asked him. Holleman argues that there is nothing in the record to suggest that Frank would have revealed his conflict of interest to Holleman (as opposed to Frank's later revelation of the conflict to an attorney who confronted him face-to-face), but there is also nothing in the record that supports the opposite assumption—that Frank would not have disclosed the conflict. Where there is more

than one reasonable interpretation from the facts (or absence of facts), we cannot say that the district court clearly erred in finding that Frank would have revealed his conflict of interest to Holleman.[3] Further, as we have suggested, even if Frank had *not* revealed the conflict, Holleman could still show cause if Frank's response constituted an external impediment to Holleman's acquiring sufficient information for a conflicts claim.[4]

---

[3] In contrast to the dissent, our reading of the evidence presented at the evidentiary hearing suggests that Frank would have revealed the factual predicate of the conflict claim to Holleman because Frank was (unreasonably) unaware that he was conflicted. Frank was convinced that Holleman was involved in the crime. Telephonic Deposition of James Frank (April 28, 2000), p. 38, at 15-17. Frank believed that a substantive defense was not available and would not have been successful. *Id.*, p. 33, at 24-25. The reason for this was that Holleman had made incriminating statements to the police. *Id.*, p. 34, at 2-3. Rather, Frank sought to win for Holleman based on a "form and procedure" defense. *Id.*, p. 32, at 21-23. This defense was apparently to get Holleman's statements thrown out based upon constitutional violations. Further, Jeffery Evans testified that Frank was very cooperative and Frank spoke a great deal about the alibi defense of his prior client, Love. Deposition of Jeffery Evans (May 1, 2000), p. 46-47. It was difficult to get Frank to "look from the perspective of his subsequent client, Mr. Holleman." *Id.* Evans also testified that he had to sit down with Frank with the notice of alibi in Love's case and said, "look don't you see a problem with this. And finally—I mean he would see the problem, he would acknowledge the conflict." *Id.*, p 47, at 14-18. This evidence indicates that Frank would have revealed, if asked, his convictions about Holleman's culpability and his defense strategy, which he would not see as presenting conflicts problem.

[4] The dissent, in attempting to lighten the burden on Holleman, emphasizes the derelictions of Frank and claims that Frank's breach of a fiduciary duty to disclose his conflicts relieves

(continued...)

An inquiry could also be futile if Frank could not be located (and that difficulty to locate Frank would constitute an external impediment). But the district court found that Frank "would [not] have been difficult to find in 1980 or 1981," *Holleman*, 101 F. Supp. 2d at 706. This finding was not clearly erroneous. Frank was a public defender in Lake County until he resigned in early 1979 or 1980. Telephonic Deposition of James Frank, p. 37, at 16-17. He continued practicing law in Lake County until around 1985 when his activities led to a twenty-three count indictment against him. *Frank v. United States*, 914 F.2d 828, 829 (7th Cir. 1990).

Thus, there was no cause for Holleman's failure to include the attorney conflict claim in his first petition and Holleman cannot overcome the abuse-of-the-writ objection to his claim.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[4] (...continued)
Holleman of any duty to inquire about them. The dissent urges reliance on Frank's silence as an external impediment to knowledge of the conflict. But, no matter how censurable the conduct of Frank, this cannot free Holleman of his obligations when seeking habeas relief. To say that Frank's silence is an external impediment is to free Holleman of his well-recognized obligation to inquire. On the other hand, we have indicated that, *if* Holleman had made an inquiry, *then* Frank's silence might have constituted an external impediment.

Rovner, *Circuit Judge*, dissenting. The majority's decision to dismiss Holleman's current habeas petition as an abuse of the writ rests on two contradictory conclusions. On the one hand, the majority holds that Judge Clement, who appointed attorney Frank to represent Holleman and who presided over Holleman's trial, had no obligation to investigate the possibility that Frank had a conflict of interest. The simple fact that Frank previously had secured the dismissal of charges against Holleman's co-defendant was not enough, my brothers reason, to alert the judge to the potential conflict. Yet, the majority goes on to conclude that Holleman, who if anything knew less about the relevant facts than Judge Clement, did have a duty to look into his attorney's potential conflict, and that he effectively forfeited his claim by not discovering the pertinent evidence by 1981, when he filed his first habeas petition. On the facts, both of these conclusions cannot be true; one proves the other wrong.

Central to my brothers' reasoning is the notion that because nothing prevented Holleman from asking his counsel about the conflict prior to 1981, he should have posed that question to Frank notwithstanding the absence of facts placing him on notice of the conflict. The law could not be more clear, however, that it was Frank's affirmative obligation to disclose the conflict without Holleman or anyone else having to ask him about it. Frank breached that obligation by not speaking up when the conflict first materialized at Holleman's trial, and he compounded the breach by restraining his advocacy on behalf of Holleman rather than jeopardizing the interests of his former client, Love. Once he had deprived Holleman of the candor and undivided loyalty to which he was entitled, Frank's interests diverged sharply from Holleman's: Frank could not have disclosed the conflict to Holleman without exposing his own profound ethical transgressions; and yet, so far as the record reveals, Frank

was the only person who knew of the conflict and the impact it had on his representation of Holleman. In realistic terms, Frank's silence impeded Holleman's ability to recognize and pursue the conflict claim. And this impediment must be regarded as one that was external to Holleman's defense, for in remaining silent about the conflict, Frank was in no way acting on Holleman's behalf or in his interest; he was protecting himself.

Only after a fourteen-year silence, a felony conviction, and the surrender of his law license did Frank at last confess the conflict that burdened him at Holleman's trial. Yet, my brothers blithely assume that had he only been asked about the conflict in 1980 or 1981, Frank surely would have disclosed it to Holleman. Given that Frank had already breached his obligation to disclose the conflict *sua sponte*, not to mention the additional fact that by 1980, Frank was engaged in a pattern of bribery that would ultimately result in his conviction for obstruction of justice (among other crimes), I find that assumption astonishing.

A sensible reading of the record makes plain that Holleman had ample cause for not discovering his attorney's actual conflict before he filed his first habeas petition in 1981. Holleman therefore did not abuse the writ by pursuing his conflict of interest claim in a later petition.

## 1.

My brothers are, of course, on solid ground in concluding that Judge Clement had no obligation, when he first appointed Frank to represent Holleman, to question the attorney about a possible conflict of interest. The Supreme Court has made clear that multiple, or in this case serial, representation of clients with potentially divergent interests does not alone require the court to make a conflicts inquiry. *Cuyler v. Sullivan*, 446 U.S. 335, 346-47, 100 S. Ct. 1708, 1717 (1980); *see also Mickens v. Taylor*, 122 S. Ct.

1237, 1245-46 (2002). Although Judge Clement necessarily was aware that Frank had succeeded in having the charges against Holleman's co-defendant, Frank Love, dismissed without prejudice, the judge (so far as the record reveals) had no way of anticipating that a zealous defense of Holleman might be adverse to Love's interests. My colleagues rightly disregard the fact that Judge Clement *did* think to ask Frank about the possibility of a conflict. *Ante* at 9. Because the facts known to the judge at that time did not obligate him to make the inquiry, the judge's question was, constitutionally speaking, gratuitous: "The fact that Judge Clement did inquire does not mean that [he] knew of a potential conflict of interest." *Ante* at 9.

I am less certain that Judge Clement remained free of any inquisitorial burden once Love's alibi became an issue at Holleman's trial. Frank had, of course, assured the judge when he was appointed that he saw no conflict; and, as the district court observed, the judge was entitled to rely on that assurance "without more red lights discernible to the court." *Holleman v. Miller*, 101 F. Supp. 2d 700, 704 (N.D. Ind. 2000); *see United States v. Fish*, 34 F.3d 488, 493 (7th Cir. 1994). However, additional warning lights did illuminate in the course of the trial. Although the charges against Love had been dismissed, his role in the offense turned out to be an important issue in Holleman's prosecution. In his post-arrest statements, Holleman had identified Love as the person who shot and killed Opfer. Trial Record ("TR") 140A (State's Ex. 20), 140B (State's Ex. 21), 143, 144, 151, 153. In retrospect, it appears undisputed that Holleman was correct in this assertion. Although, so far as the record reveals, the State never attempted to reinstate the charges against Love, even the Indiana Supreme Court's opinion affirming Holleman's conviction identifies Love as the shooter. *Holleman v. Indiana*, 400 N.E.2d 123, 124-25 (Ind. 1980); *see* 28 U.S.C.

§ 2254(e)(1) ("a determination of a factual issue made by a State court shall be presumed to be correct"). But at Holleman's trial, this point was very much in dispute. Consistent with his post-arrest statements, Holleman's theory of defense was that he was a hapless, drug-impaired bystander to a chaotic series of events that culminated in Opfer's death. *See*, *e.g.*, Post-Conviction Record ("PR") 317-18 (defense closing argument). In an effort to discredit that defense, the State sought to prove that it was *Holleman*, not Love, who shot Opfer. *See* PR 296 (State's opening statement). Toward that end, the State not only elicited evidence that the charges against Love had been dismissed, TR 170-71, but summoned Mary Schaar to establish Love's alibi, Tr. 171-79.[1] By this juncture, it would have been plain to the judge that this was not a case of mere successive representation of co-defendants. Judge Clement knew from the outset that the charges against Love had been dismissed without prejudice, for it was he who had granted the State's *nolle prosequi* motion. Once Love's role in the offense was raised at Holleman's trial, it should have been apparent to the

---

[1] This evidence laid the foundation for a theme that the State pursued vigorously in its closing arguments—that as the likely "triggerman," Holleman was the person most culpable (if not *solely* responsible) for the robbery and killing of Robin Opfer (as well as Scott Moore), and that Holleman's post-arrest statements were incredible to the extent they attempted to pin the blame for Opfer's murder on Love and the other participants in the robbery. *See*, *e.g.*, PR 302 ("[Holleman] was the principle [sic], he pulled the trigger, and he worked alone."); 308 ("I submit Frank Love was nowhere near that apartment on the 5th day of October, '76. He is now dismissed out of this case."); 315 ("The night of the 5th, I submit to you, Robert Holleman killed Robin Op[f]er."); 321 ("The murder of Scott Moore, I submit to you, was committed by the defendant."); *see also* PR 296, 305, 307, 309, 310, 312, 313-14.

judge that Frank was in an untenable position. Frank could not further his current client's cause without sacrificing his former client's interests; any effort that Frank might make to implicate Love as the shooter necessarily would jeopardize the dismissal of the charges against Love. Having presided over Love's case as well as Holleman's, Judge Clement needed no special insight to discern the conflict. That Frank remained silent when the State elicited testimony regarding the dismissal of the charges against Love, and that he chose not to cross-examine Schaar about Love's alibi, confirmed the need to re-examine Frank about the conflict.

My colleagues acknowledge the possibility that Judge Clement, even if he was not obliged to investigate the possibility of a conflict at the time he appointed Frank, might have become obliged to do so later. *Ante* at 7-8, 10. However, they sustain as not clearly erroneous the district court's conclusion that the judge never incurred such an obligation, even when Love's role in the offense emerged as a key issue at Holleman's trial. *Id.* at 10. Yet, the district court's finding in this regard is conclusory: The court simply stated that "Mr. Frank may have been obliged to inform the court of his ethical quandary once Ms. Schaar appeared on the witness stand, but nothing required the court to conduct an inquiry then, earlier, or later." 101 F. Supp. 2d at 705. In the run-up to that conclusion, the court noted that when Judge Clement had appointed Frank to represent Holleman, he knew nothing that would have alerted him to a potential conflict beyond the fact that Frank had previously represented Love and that the charges against Love had been dismissed. *Id.* at 704. At that point in time, the court emphasized, Frank himself could not have anticipated that the State would call Schaar to testify at Holleman's trial. *Id.* But nowhere in its analysis did the court consider the changed landscape that Judge Clement confronted once the

trial was underway and the conflict between the State's theory of the case (that Holleman was the shooter) and Holleman's position (that Love was the shooter) became manifest. *See id.* at 704-05. I must therefore question the decision to defer to that aspect of the district court's decision.

**2.**

Let us suppose however, that indeed the facts known to Judge Clement never sufficed to put him on notice of a potential conflict of interest. That conclusion, it seems to me, supplies Holleman with cause for his failure to pursue his claim of actual conflict sooner than he did. On the facts, any other conclusion makes no sense.

Recall that Holleman lacked the evidence necessary to establish an actual conflict until 1991, when Holleman's post-conviction counsel finally tracked Frank down for the second time and Frank, reluctantly it seems, at last acknowledged the conflict. *See ante* at 12. No one is arguing that Holleman knew about this conflict in 1981, when he filed his first habeas petition, and that he simply chose to sit on the evidence. The argument that Holleman abused the writ is premised instead on the theory that the pertinent information was *available* to Holleman prior to 1981, such that he could (and should) have raised the conflict claim in his first habeas petition. I think that the facts supply us with great reason to doubt that the evidence necessary to establish Frank's divided loyalties really was available to Holleman prior to 1981, and I shall have more to say about that in a moment. But first I think it necessary to question whether Holleman was under any obligation to go in search of that evidence prior to 1981. In my view, he was not.

*McCleskey v. Zant* requires only that a habeas petitioner exercise due diligence in the identification and pursuit

of his claims. 499 U.S. 467, 498, 111 S. Ct. 1454, 1472 (1991). When he files his initial federal habeas petition, the petitioner must present not only claims of which he is actually aware, but also those as to which he is on notice and therefore could have developed through diligent investigation. *Ibid.* If he fails in his first petition to pursue a particular claim, the legal and factual basis for which was reasonably available to him at that time, the claim will be foreclosed to him later under the abuse-of-the-writ doctrine, absent proof that a fundamental miscarriage of justice would result. *Id.* at 493-94, 497-98, 111 S. Ct. at 1470, 1472. *McCleskey* does not, however, require the petitioner to divine potential claims that he neither knows about nor has reason to know about. *See*, *e.g.*, *Amadeo v. Zant*, 486 U.S. 214, 222, 108 S. Ct. 1771, 1777 (1988), cited in *McCleskey*, 499 U.S. at 498, 111 S. Ct. at 1472. If the claim was "reasonably unknown" to the petitioner when he filed his first habeas petition, *Reed v. Ross*, 468 U.S. 1, 14, 104 S. Ct. 2901, 2909 (1984), he remains free to pursue the claim in a later habeas petition. Thus, we can say that Holleman abused the writ by pursuing his claim of actual conflict in a second habeas petition only if the facts reveal that he was on notice that his attorney may have been burdened by such a conflict at the time he filed his first petition. *See McCleskey*, 499 U.S. at 498-500, 111 S. Ct. at 1472-73.

Here is where the majority's rationale sustaining Judge Clement's own failure to investigate the possibility of a conflict comes into play. My brothers' conclusion that the judge had no occasion to ask Frank about the conflict demonstrates why Holleman was not on notice of the conflict claim. So far as the record reveals, Holleman's knowledge of the circumstances underlying the conflict was no greater than Judge Clement's. *See* 101 F. Supp. 2d at 705. The facts known to the judge revealed only that Frank had previously represented Holleman's co-

defendant and that the charges against Love had been dismissed. If those facts were not enough to obligate Judge Clement to look into the possibility of a conflict of interest on Frank's part, then there is no reason to think that Holleman, a non-lawyer, had reason to question his lawyer's loyalties either. Indeed, the trial record suggested to neither Holleman's appellate lawyer nor his post-conviction counsel that Holleman had a basis on which to assert a claim for conflict of interest. PR 269; Deposition of Jeffery A. Evans ("Evans Dep.") 7; *see ante* at 10.

To say that Frank's successive representation of Love and Holleman was by itself enough to alert Holleman to the possibility of a conflict and to require him to investigate that claim (*ante* at 15) is to hold the unwitting client to a higher standard of inquiry than the very judge who created the conflict of interest by appointing the same attorney to represent two co-defendants. No justification supports the double standard in this case.[2]

---

[2] Although my colleagues attempt to differentiate Judge Clement's obligation to investigate potential conflicts of interest from Holleman's own duty, I find the distinction they draw unconvincing. My colleagues reason that whereas "[t]he purpose of the trial judge's inquiry is to ensure that the defendant is receiving a fair trial," *ante* at 13, the aim of the petitioner's inquiry is "to research historical facts that could form the basis for habeas claims," *ante* at 14. These are but two sides of the same coin, however: The trial judge acts to protect the defendant's rights, while the habeas petitioner seeks to establish the ways in which his rights were not honored. Just as a judge cannot be expected to make a reasoned and fair decision when the relevant facts are kept from her, a petitioner cannot be expected to challenge a deprivation of his rights when he is unaware that a deprivation has even occurred. The duty of inquiry for judge and petitioner alike is defined in terms of notice. If, as my colleagues have concluded, the facts confronting Judge Clement were not suffi-

(continued...)

At *most* Holleman's knowledge was on par with the judge's, and in realistic terms, Holleman knew significantly less. *See* 101 F. Supp. 2d at 705. Holleman did not have the first-hand knowledge of the disposition of Love's case that Judge Clement did by virtue of having been the presiding judge. Holleman did not even know that the judge had thought to ask Frank about the possibility of a conflict, since that discussion took place in an unrelated proceeding outside of Holleman's presence. *Ante* at 8. Moreover, although we have said that Judge Clement was not required to ask that question, *ante* at 9, we have also said that the judge was entitled to rely on Frank's assurance that he saw no conflict, *ante* at 9-10. It is the attorney's duty to speak up when a conflict becomes apparent, the Supreme Court and this court have emphasized, *Cuyler*, 446 U.S. at 346, 100 S. Ct. at 1717; *Holloway v. Arkansas*, 435 U.S. 475, 485-86, 98 S. Ct. 1173, 1179 (1978); *Fish*, 34 F.3d at 493, so unless and until Frank voiced a concern, the judge was entitled to assume all was well. *Ante* at 9-10. Sauce for the goose is sauce for the gander. In the face of Frank's silence about a conflict, Holleman too ought to have been entitled to assume that no conflict existed.

My colleagues posit that Holleman would have had cause for not pursuing the conflict of interest if, like Judge Clement, Holleman had asked Frank about a conflict and Frank had given him the same reassuring answer that he gave the judge. *Ante* at 7, 13, 16. This implies that Holleman could have justifiably relied on a false representation from Frank about the conflict, but not on Frank's silence. Here again my colleagues fail to ap-

---

[2] (...continued)
cient to alert him to a conflict and thus to compel an inquiry, then the same facts could not, without more, have obligated a layman in Holleman's position to inquire.

preciate the significance of the attorney's obligation to speak when confronted with a conflict. An omission is treated as the equivalent of an affirmative misrepresentation when an individual knows a material fact but fails to disclose it to another person to whom he owes a fiduciary duty. *See, e.g.*, *S.E.C. v. Zandford*, 122 S. Ct. 1899, 1905 (2002). Indubitably, the relationship between an attorney and his client is fiduciary in nature. *E.g.*, *Sanders v. Townsend*, 582 N.E.2d 355, 358 (Ind. 1991).

> There are few of the business relations of life involving a higher trust and confidence than that of attorney and client, or, generally speaking, none more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party best owing it.

> \* \* \*

> It is a basic principle of professional conduct that an attorney must faithfully, honestly, and consistently represent the interest and protect the rights of his client, and that he is bound to discharge his duties to his client with the strictest fidelity, to observe the highest and utmost good faith, and to inform his client promptly of any known information important to him.

*Bell v. Clark*, 653 N.E.2d 483, 489-90 (Ind. App. 1995), *aff'd and adopted*, 670 N.E.2d 1290 (Ind. 1996), quoting *Blasche v. Himelick*, 210 N.E.2d 378, 381 (Ind. App. 1965). In view of the fiduciary character of this relationship, it is not the client's duty to ask about conflicts of interest, it is his attorney's obligation to disclose them on his own initiative. *See Cuyler*, 446 U.S. at 346, 110 S. Ct. at 1717; *Holloway*, 435 U.S. at 485-86, 98 S. Ct. at 1179; *United*

*States v. Mandell*, 525 F.2d 671, 677 (7th Cir.) (per curiam), *cert. denied*, 423 U.S. 1049, 96 S. Ct. 774 (1976); *see also*, *e.g.*, *Campbell v. Rice*, 265 F.3d 878, 885 n.2 (9th Cir. 2001), *abrogated on other grounds by Mickens v. Taylor*, 122 S. Ct. 1237, 1243 n.3 (2002); *In re Young*, 91 F.3d 1367, 1375 (10th Cir. 1996); *I.B.M. Corp. v. Levin*, 579 F.2d 271, 281-82 (3d Cir. 1978); *Holland v. Henderson*, 460 F.2d 978, 981 (5th Cir. 1972); *Felix v. Balkin*, 49 F. Supp. 2d 260, 271-72 (S.D.N.Y. 1999); Indiana Rules of Professional Conduct 1.4(b); 1.7(b)(2); 1.9(a); 1.16(a)(1). As Justice Story observed more than 175 years ago:

> An attorney is bound to disclose to his client every adverse retainer, and even every prior retainer, which may affect the discretion of the latter. No man can be supposed to be indifferent to the knowledge of facts, which work directly on his interests, or bear on the freedom of his choice of counsel. *When a client employs an attorney, he has a right to presume, if the latter be silent on the point, that he has no engagements, which interfere, in any degree, with his exclusive devotion to the cause confided to him; that he has no interest, which may betray his judgment, or endanger his fidelity.*

*Williams v. Reed*, 29 F. Cas. 1386, 1390 (C.C. D. Maine 1824) (No. 17, 733) (emphasis mine). Thus, Holleman was every bit as entitled to rely upon Frank's silence as a signal that he labored under no conflict as Judge Clement was to rely on Frank's words to that effect.

For purposes of the cause analysis, Frank's silence posed an external impediment to Holleman's ability to recognize and pursue the conflict claim in habeas proceedings. *See McCleskey*, 499 U.S. at 497-98, 111 S. Ct. at 1472, citing *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986); *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S. Ct. 2546, 2566 (1991); *see also*, *e.g.*, *Amadeo*, 486 U.S. at 222, 108 S. Ct. at 1777; *Crivens v. Roth*, 172 F.3d 991, 995-96 (7th Cir. 1999); *Jennings v. Purkett*, 7 F.3d

779, 782 (8th Cir. 1993) (divided loyalties of petitioner's counsel can supply cause for procedural default); *Jamison v. Lockhart*, 975 F.2d 1377, 1380 (8th Cir. 1992) (same). As the Supreme Court has recognized, it is the attorney—not his client or the court—who is in the best position to recognize conflicts of interest. *Mickens*, 122 S. Ct. at 1241; *Holloway*, 435 U.S. at 485, 98 S. Ct. at 1179. Indeed, so far as the record in this case reveals, no one *but* Frank actually knew about the conflict that materialized in the course of Holleman's trial until 1991, when Frank finally confessed the conflict to Holleman's post-conviction counsel. By not disclosing the conflict when it arose, Frank breached his ethical obligation to Holleman.[3] To make matters worse, Frank then abandoned his advocacy on behalf of Holleman. As Frank would later acknowledge, when Mary Schaar took the stand to establish Love's alibi and in this way bolster the State's theory that Holleman was the triggerman in Opfer's murder, Frank was presented with an untenable dilemma: Jeopardize the interests of his former client, Love, by attempting to discredit Schaar's testimony, or jeopardize the interests of his current client, Holleman, by remaining silent. *See* PR 199-200. Frank chose the latter course. Sacrificing one client for another in this way is an especially "pernicious" ethical breach. *United States v. Marshall*, 488 F.2d 1169, 1194 (9th Cir. 1973), quoting *Holland v. Henderson*, 460 F.2d

---

[3]   Although cases such as *Holloway* and *Cuyler*, which recognize the attorney's duty to disclose conflicts of interest, were decided after Holleman's 1977 trial, the notion was by no means novel. As Justice Stevens recently observed, "[t]he lawyer's duty to disclose his representation of a client related to the instant charge is not only intuitively obvious, it is as old as the profession." *Mickens*, 122 S. Ct. at 1249 (Stevens, J., dissenting). Indiana's rules of professional conduct embodied that duty well before Holleman's trial. *See*, *e.g.*, *In re Smith*, 351 N.E.2d 1, 3 (Ind. 1976); *In re Farr*, 340 N.E.2d 777, 784-85 (Ind. 1976); *Carlson v. Carlson*, 266 N.E.2d 807, 809 (Ind. App. 1971).

at 981. At this point, Frank's interests were adverse to Holleman's: Holleman had an obvious right and need to know that his attorney's conflict of interest had caused him to censure his own advocacy; but for Frank to disclose the conflict belatedly would be to acknowledge that he had committed profound ethical violations. Not surprisingly, Frank chose to remain silent. He hid the evidence that would have enabled Holleman to assert the conflict-of-interest claim, just as surely as an errant prosecutor might hide his suppression of exculpatory evidence or a trial judge might hide his bribe-taking and so impede a petitioner from pursuing those constitutional violations. Against that backdrop, Holleman cannot reasonably be expected to have pursued the conflict-of-interest claim in his 1981 habeas petition. *Cf. Amadeo*, 486 U.S. at 224, 108 S. Ct. 1777-78 (sustaining finding that habeas petitioner had cause for failing to make state-court challenge to composition of juries that indicted, convicted, and sentenced petitioner to death, where State had concealed racial manipulation of jury pools and memorandum revealing such manipulation was discovered by chance after time for pursuing jury claim in state court had already passed); *Crivens*, 172 F.3d at 995-96 (finding that habeas petitioner had not procedurally defaulted *Brady* claim notwithstanding his failure to raise that claim in state court, given that State had not disclosed information which formed basis for claim until after he had filed his federal habeas petition); *Parkus v. Delo*, 33 F.3d 933, 938 (8th Cir. 1994) (finding cause for procedural default of claim relating to petitioner's mental health, where petitioner's counsel had relied on false representation of state official that petitioner's juvenile mental health records had been destroyed).[4]

---

[4] My colleagues read the Fourth Circuit's opinion in *Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001), *aff'd*, 122 S. Ct. 1237

(continued...)

Ah, the court points out, but Holleman himself voiced suspicions about his lawyer's divided loyalties when he flagged the matter for his appellate and post-conviction lawyers; and that suspicion, they believe, obligated him to inquire further. *Ante* at 11-12, 15. True enough, Holleman did think to mention Frank's representation of Love and himself to counsel, but so far as the record reveals, nothing more than a naked hunch prompted him to do so. There is absolutely no evidence that Holleman had any inkling that an actual conflict of interest burdened Frank's representation of him. Recall that it occurred to Judge Clement himself to ask Frank whether he thought that the dual representation presented any conflict, yet we have said that the judge's question does not signal that he was on notice of the conflict and thus under an obligation to investigate it. *Ante* at 9. Holleman's own subjective concerns, unsupported by facts sufficient to have placed him on reasonable notice of a conflict, are similarly beside the point.[5]

---

[4] (...continued)
(2002), to imply that an attorney's silence as to his conflict of interest does not alone excuse the petitioner's failure to investigate the conflict. *Ante* at 12-13. I believe that they read too much into that court's holding however. It is true that the *Mickens* court cited both the attorney's silence and the secrecy of juvenile court records as the basis for its conclusion that the petitioner had established cause for his failure to raise the conflict in a timely manner. 240 F.3d at 356. However, at no point did the court consider whether the lawyer's silence by itself would have been insufficient to excuse the procedural default; that question simply was not presented.

[5] Holleman's testimony before the district court confirms that nothing more than a hunch prompted him to first mention Frank's successive representation of Love and himself to his appellate counsel, Dennis Kramer. Holleman explained:

And I was really putting forth ideas [in a letter] to Mr. Kramer so that he could—so that I could sort of help him
(continued...)

---

[5] (...continued)

> formulate issues for the appeal, basically. At one point in the letter, I think I said something to him like, 'There was something wrong with the representation of Mr. Frank when he represented Mr. Love earlier and then represented me, but I can't pinpoint it. I just have a gut feeling that there is something wrong there,' and I stated that to him in my letter. . . . I didn't know what was wrong. I just had a feeling that something was wrong. . . . .")

Transcript of Hearing on Petition for Writ of Habeas Corpus ("THC") 28; *see also id.* at 41, 53. Kramer himself concluded that the mere fact of Frank's successive representation of Love and Holleman did not supply a basis for a conflict of interest claim, *see* PR 269, and Holleman relied on Kramer's assessment, THC 30. Years later, when Holleman met with his post-conviction counsel, Jeffery Evans, to discuss potential grounds for post-conviction relief, Holleman again mentioned the issue, but only in passing. Holleman testified:

> Mr. Evans was in the doorway leaving. We were in a little attorney booth. And I made a comment to him sort of off-handedly that, you know, "You may want to look into this. This lawyer that represented me also represented my co-defendant."

THC 34. Evans' recollection of the conversation was similar:

> I believe I'd even gotten up from my chair and was about to leave and trying to get things wrapped up and I was probably tired at that point. Robert looked at me and said something to the effect of remember at the beginning of this you told me to tell you everything? I said yeah, Robert, tell me everything. At that point he informed me that his attorney had previously represented a co-defendant in this case. And he was very—in telling me that, he was very sheepish about the whole thing. I think he was trying to show me that he was complying with my demand to tell me everything. And that's how it first came to my attention.

Evans Dep. 11.

**3.**

But even if we assume that Holleman did have an obligation to look into the conflict before he filed his first habeas petition in 1981, he can be faulted for the failure to present the conflict of interest claim in that petition only if the evidence necessary to support the claim was reasonably discoverable at that time. *See McCleskey*, 499 U.S. at 497-98, 111 S. Ct. at 1472. Based on the fact that Frank ultimately confessed the conflict when questioned in 1991, the district court and my colleagues discern no reason why he would not have acknowledged the conflict prior to 1981. *Ante* at 16-17 & n.3; 101 F. Supp. 2d at 705-06. In their view, Holleman is to blame simply for failing to ask Frank about the conflict sooner than he did. This notion strikes me as wrong for a number of reasons.

First, Frank had no right to wait for the question. He had an unequivocal duty to speak up when the conflict of interest materialized during Holleman's trial. Yet rather than disclosing the conflict *sua sponte*, he chose to remain silent and let Holleman's interests suffer. Having already failed to disclose the conflict when ethics required it of him, it strikes me as implausible to suppose that he would have suddenly become candid if only his client had thought to ask him whether he had experienced a conflict.[6]

Second, in view of Frank's silence in the first instance, belated disclosure would have come at a price. After all,

---

[6] In fact, by the time Holleman was preparing his direct appeal, Frank had already terminated communications with Holleman. After Holleman had sent Frank a second letter inquiring about potential issues to raise on appeal, Frank told Holleman that he should direct all future inquiries to Dennis Kramer, his appellate counsel, rather than to Frank.

Frank had not only failed to disclose the conflict but had chosen to give Holleman's interests a back seat to Love's. These were grave ethical violations which, if disclosed, would have placed Frank's law license in jeopardy. We have no reason to think that Frank would have fallen on his sword in 1980 or 1981 to help Holleman win relief in habeas corpus.

Third, Frank's failure to disclose the conflict that burdened him at Holleman's trial was by no means an isolated breach of ethics on his part. In 1985, a 23-count indictment charged Frank with scheming to obtain favorable outcomes for clients who were charged with driving under the influence of alcohol by bribing judges, court personnel, and other public officials to destroy records, to divert notices that the Indiana Bureau of Motor vehicles should have received, and to commit a variety of other dishonest acts. *See Frank v. United States*, 914 F.2d 828 (7th Cir. 1990). The final count of the indictment also charged Frank with obstructing justice based on his attempt to interfere with a grand jury investigation. Apparently Frank had tried to persuade one of his former DUI clients to give false information to the grand jury that was investigating Frank. *See id.* at 834 & n.11. Frank ultimately pleaded guilty to the obstruction charge along with one count of mail fraud, and he resigned from the practice of law. These charges are relevant in two respects. First, the indictment indicated that Frank had been engaged in the charged scheme since at least January of 1980. *Id.* at 830 n.5. Generally speaking, criminals do not willingly bring themselves to the attention of the authorities. For that reason, it strikes me as unlikely that Frank would have divulged his ethical breach in 1980 or 1981, as Holleman was preparing his first habeas petition, since to do so might well have triggered an inquiry by the Indiana bar. Second, Frank's admitted effort to obstruct justice suggests that his first inclination, when confronted with an investiga-

tion into his own conduct, was not to be forthcoming but rather to lie about it and to solicit others to do so.

Years later, Frank finally did acknowledge his conflict of interest. By that time, he was a convicted felon whose legal career was at an end; he had absolutely nothing to lose. But even then, Frank's admission was a reluctant one. When Holleman's attorney first interviewed him in 1988, all that Frank could focus on was his successful representation of Love. *See* Evans Dep. 20-27. Not until a second meeting in 1991 did Frank finally admit that his divided loyalties had kept him from cross-examining Schaar. *Id.* at 42-48. Frank's hesitation to acknowledge the conflict even at that late date demonstrates in yet one more way why the evidence necessary to establish Holleman's claim was not reasonably available to him at the time of his first habeas petition.

### 4.

This record lends absolutely no support to the conclusion that Holleman abused the writ of habeas corpus. Only through the extraordinary efforts of Holleman's post-conviction counsel, years after Holleman filed his first habeas petition, did Frank's conflict of interest at last come to light. To say that Holleman ought to have investigated the claim sooner is to say that the mere fact of Frank's serial representation of Love and Holleman was enough to alert Holleman to the potential conflict of interest, but not Judge Clement. To say that Frank would have disclosed the conflict prior to 1981, if only he had been asked, is to ignore (along with Frank's history of ethical breaches) the fact that it was Frank's obligation to volunteer that he was conflicted, not the obligation of anyone else to ask him about it. Today's holding is devoid of common sense and the result is contrary to justice.

I respectfully dissent.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*