IN THE MATTER OF JOHN A. FARR; IN THE MATTER OF
THOMAS L. HULSE.

[Nos. 974S196, 974S197. Filed February 3, 1976.]

*Steward, Irwin, Gilliom, Fuller & Meyer,* of Indianapolis,
for respondents.

*Richard H. Grabham,* Executive Secretary, *David B.*

*Hughes,* Trial Counsel, for the Indiana Supreme Court Disciplinary Commission.

PRENTICE, J.—This is a disciplinary matter and is before the Court for consideration and disposition upon the findings of fact, conclusions and recommendation of Philip S. Kappes, the Hearing Officer, the Disciplinary Commission's petition and supporting brief for review thereof and the Respondent's brief in opposition to said petition.

The Court, having considered the foregoing, now denies the Commission's petition as to the Hearing Officer's findings of fact and now adopts said findings but grants said petition as to the Hearing Officer's conclusions and recommendation; and having considered said findings of fact, now adopts the Hearing Officer's conclusions, as fully supported by said facts, but declines to follow his recommendation that no discipline be imposed.

The very complicated circumstances of this case present classic and intricate questions of conflicts of interest and the impropriety and appearance of impropriety that may flow therefrom, which this Court believes are matters frequently overlooked by otherwise highly ethical lawyers. In view of the recent origin of our program for the discipline of lawyers of this state and the improvement of the public image of the legal profession, the publication of the adopted findings and conclusions in full is warranted, in order that all may be adequately forewarned of the delicate balance often obtaining between ethical and unethical practices and the attitude of this Court regarding sanctions for violations.

## "HEARING OFFICER'S FINDINGS OF FACT, DETERMINATIONS, AND RECOMMENDATIONS

"The Disciplinary Commission of the Supreme Court of Indiana (The Commission) has charged John A. Farr and Thomas L. Hulse (Respondents) with violation of the Code of Professional Responsibility as adopted March 8, 1971, and

the preexisting Canons of Professional Ethics. The precise charges will be examined in the course of these Findings of Fact, Determinations, and Hearing Officer's Recommendations. The matters, though filed separately as to each Respondent (Hulse, Cause No. 974S196 and Farr, Cause No. 974S197) were by consent of Respondents' counsel heard jointly, and are dealt with jointly in these findings.

## "THE FACTUAL BACKGROUND

"Most of the evidence is undisputed. It was voluminous. Essentially the Respondents, as practicing attorneys, were employed by the complaining witness, Lena Mae Smiley, (Smiley) and her fourteen year old son, Michael Helterbrand, (Michael) to represent them in a claim for personal injuries to Michael arising out of a fatal automobile accident that occurred on or about October 18, 1966.

"Michael was a passenger in the automobile of William Lee Crooks (Crooks I) an unlicensed operator of the vehicle along with another passenger, Terry Prifogle (Prifogle). The collision was "head on" on State Road 123, just West of its intersection with County Road 825 West. The other vehicle was owned by the Town of Lapel, Indiana, and was operated by James E. Fisher a Deputy Town Marshal employed by the Town of Lapel who was accompanied by another Lapel Deputy Town Marshal, William Stanford. There was evidence that the Marshal's vehicle was traveling at a high rate of speed at night without headlights or emergency lights. The impact occurred on the right hand side of the road for the police vehicle, but there was evidence that immediately prior to the collision it had been traveling on the left hand side of highway 123.

"Prifogle died instantly. All others sustained varying degrees of injury. Michael being perhaps the most severely and permanently injured.

"Smiley employed Respondents to act as attorney for her son and herself. During the course of such representation,

Respondents advised Smiley that her son had no cause of action against Crooks I (the host driver) because Michael gave a statement indicating no improper driving on the Part of Crooks I. Respondents recommended proceeding against the police officer, driver and Town of Lapel and not against Crooks I. Mrs. Smiley concurred and authorized the attorneys to proceed.

"During the course of this employment it became known that Respondents law firm was regularly employed as counsel for Farm Bureau Insurance Company and that this company held the liability coverage on the automobile driven by Crooks I and owned by his father William H. Crooks (Crooks II). Thereafter while continuing to represent Smiley and Michael, Respondents undertook to aid in the defense of Crooks I in a criminal proceeding wherein he had been charged with:

I Involuntary Manslaughter
II Reckless Homicide
III Causing the death of another, etc.
IV Driving a vehicle, etc.

Crooks I was found guilty of Count IV. The verdict was found on appeal to be erroneous. (*Crooks* v. *State*, (1971) 256 Ind. 72, 267 N.E.2d 52).

"Respondents also represented Crooks I in four civil actions filed against him by Fisher, Stanford, Prifogle's Estate, and a subrogation suit by Indiana Insurance Co. for the property damage to the Lapel Marshal's auto.

"Respondents initiated suit on behalf of Smiley and Michael about October 10, 1968, and continued in such representation until they withdrew December 14, 1971, after notifying Smiley in advance of this intention. The suits as filed named the Town of Lapel and Fisher as Parties Defendant. No other Defendants were added to these suits nor were demands made against any other persons during Respondents' representation of Smiley and Michael. I find that the foregoing

statement of facts is true and supported by the evidence presented.

"Other pertinent facts and points of evidence will be referred to in connection with the issues discussed elsewhere herein.

"The cause was ably presented to this Hearing Officer by Counsel for the Commission and Respondents. It consisted of a stipulation of fact, seven Commission witnesses, and fifty-six Commission Exhibits, and twelve witnesses and fifteen exhibits for Respondents. The testimony of the Witnesses was taken and has been transcribed by the Court provided stenotype reporter.

"The evidence was presented in complete form. The parties appeared to spare no effort to discover and present every pertinent facet of this case. For this reason we have for consideration numerous issues some of which appear to be matters of first impression under the Code of Professional Responsibility.

"I

"The first question presented concerns the applicability of the Canons of Professional Ethics and the Code of Professional Responsibility to this proceeding.

"The problem arises from the fact that at the inception of Respondents' employment (Oct. 1966) the ethical standards with which Indiana lawyers were charged were the Canons of Professional Ethics. (Canons) At the time of the termination of employment (Dec. 1971) lawyers were governed by the Code of Professional Responsibility (Code adopted March 8, 1971). At the hearing counsel for Respondents stated that their clients were willing to be tested by the highest ethical standards and they thereby waived their paragraph of answer questioning the applicability of the Code of Professional Responsibility. For this Respondents must be commended. Nonetheless, the Hearing Officer is still confronted with the question of whether or not it is within the power of Re-

spondents to waive their rights and to consent to being judged by the Code rather than the Canons.

"The Supreme Court has plenary power over the admission and disbarment of attorneys authorized to practice before the Courts of Indiana. This power includes the power to establish ethical standards which govern the conduct of lawyers. This the Indiana Supreme Court has done. In 1966 the standards were the Canons, in 1971 the standards were the Code.

"That there should be an established set of ethical standards promulgated in advance of any attempt to discipline lawyers for violation thereof is only 'fair play' and too obvious to require elaboration. However, there appears to be no reason why a lawyer may not, with his consent, be judged by a standard higher than that established by the Supreme Court. The Respondents have so consented. This Hearing Officer will, therefore, test the conduct of Respondents by both the Canons and the Code; and recommends this procedure to the Court.

## "II

"The function of the hearing officer is to find facts, make conclusions of law and, where so disposed, make recommendations for discipline or non-discipline to the Court.

"In viewing the proceedings here presented it must be remembered that we are required to determine whether Respondents have been guilty of some unethical conduct. In discharging this rsponsibility we must, of necessity, review not only what they did in representing their client; but also what they might have done.

"It is not required that we determine the correctness of the services rendered or legal advice given. Our sole function is to examine Respondents' professional conduct and to measure that conduct against applicable ethical standards (here: the Canons and the Code).

"So far as human mentality is capable, we are to examine this conduct in the light of the circumstances existing or reasonably ascertainable at the time they occurred. 'Hindsight' in this exercise should be shunned, even though it may, at times, be difficult to separate in the body of the evidence.

"This is a classic conflict of interest case which presents, as well, the question of the scope of a lawyer's authority to proceed in the face of such conflict with the informed consent of all parties to the conflict.

## "III

"*Was there a conflict of interest between Smiley and Michael on the one hand and Crooks I on the other?*

"Respondents argue that Michael consistently related the same facts regarding the accident, i.e. asserting that Crooks I had been drinking, appeared drunk, but did not drive in a drunken manner, was preparing to make a left turn to take Michael home, at Michael's request, observed the marshal's vehicle approaching at a high rate of speed without lights on the wrong side of the road and thereupon blinked his lights and swerved to the left to avoid the oncoming vehicle. They further assert that no other facts brought to light by their own investigation contradict this version of the incident. Therefore they advised their clients, Smiley and Michael, that there was no cause of action against Crooks I, pointing out that mere negligence would be insufficient to support a guest case; and that to win a guest case against Crooks I, willful and wanton misconduct would have to be proven. Respondents thus concluded that Michael's own testimony which he could not, in good conscience, ever repudiate would show that Crooks I wasn't negligent, let alone prove willful and wanton misconduct. They then argued that since Michael's own testimony would foreclose any recovery against Crooks I, that there could be no possible conflict of interest and hence no possible ethical misconduct.

"This Hearing Officer does not agree. While the legal con-

clusion was fairly determined by Respondents, this did not obviate the fact that a conflict of interest between Crooks I and Michael did exist. Counsel's advice regarding strategy in pursuing Michael's claim did not change the factum of existence or nonexistence of a possible claim. A host driver is always in a position of exposure to a claim by a guest if an accident occurs. Michael's version of the accident, while weakening his guest claim, did not utterly destroy it. There were too many other elements pointing to possible liability as to Crooks I. These include:

"1. Michael's age and maturity as well as his grievous injuries which might well have impaired his memory or judgment as to the facts surrounding the accident.
"2. The subsequent indictment and conviction of Crooks I on the Criminal charges.
"3. The presence of .17% blood alcohol in Crooks I.
"4. The physical facts surrounding the accident, i.e. its occurrence on the right-hand side of the highway for the Marshal's vehicle.
"5. The explosive emotional factors present in the case such as Crooks I's prior driving record, and his propensity for strong drink as suggested in the many reports made to Farm Bureau by Respondent Farr.
"6. Michael's statement that Crooks I 'appeared drunk.'
"7. The presence of beer in the Crooks I auto.
"8. Michael's statement confirmed by Crooks I that he asked to be let out.

Therefore, there was a conflict of interest between Michael and Crooks I.

"IV

"*Was the conflict of interest such that after appropriate disclosure, an attorney could adequately represent the conflicting interest?*

"It is well settled that there are certain disputes or conflicts of interest which are so adverse that an attorney simply may not under any circumstances represent both parties to the conflict. See *Jedwabny* v. *Philadelphia Transportation Co.*, 390 Pa. 231 135 A.2d 252, wherein the Court at page 254 of the Atlantic Reporter said:

" 'But manifestly, there are instances where the conflicts of interest are so critically adverse as not to admit of one attorney's representing both sides.'

"This case does not fall within the category of cases where multiple representation is absolutely prohibited. While this Hearing Officer is of the opinion that a conflict did exist; nonetheless, with proper disclosure, the dual representation could be ethically undertaken without violation of the Canons or the *Code*.

"The particular position of the parties, i.e. guest and driver, were such that, given an adequate disclosure, Michael, Smiley and Crooks I, as well as the insurer, could have decided that they had no claim against one another or have waived any claim they had in favor of a united front against Fisher and the Town of Lapel. In this instance each could adequately have been represented by the same attorney. Attorneys Howard Young and Earle A. Kightlinger, witnesses for Respondents, and indeed all the attorneys called to testify, stated unequivocally that a judgmental decision had to be made in this case as to whether or not both Crooks I and the Town of Lapel and the Marshals should be joined in a single case. Because of the disparity of proof required to prove the guest case and that required to prove the case against the Town, they counseled against joining multiple defendants. They pointed out that each defendant would point to the other and say: 'He is at fault, not me', thus risking hopeless confusion before a jury.

"The analysis of these expert witnesses confirms that the judgmental decision made by Respondents in electing to pursue Smiley and Michael's claim against the Town of Lapel and the marshal only was professionally and ethically proper. Moreover, having made this decision they could ethically, after full disclosure to their two clients, proceed with the representation because they would have resolved the conflict between them.

"Another potential point of conflict exists which was not

alluded to by either the Commission or the Respondents. Respondents may have honestly and conscientiously (even correctly) concluded that Michael (and Smiley) had no cause of action against Crooks I. However true this may have been, it does not confer upon Respondents the right to reveal their client's confidences to Crooks I and his insurance carrier.

"Michael's story was his property, communicated to his attorney within the attorney-client privilege. Since as to Crooks I Michael's version of the story was detrimental to his interests, it became a 'confidence' or 'secret' which Respondents were obliged to keep inviolate under Code Section DR 4-101A.

"Or put another way, while Respondents were not obliged to prosecute an action against Crooks I since they honestly believed the claim to be unsupportable, it does not follow that they had the prerogative to reveal this information to Crooks I or his insurer.

"For the two reasons given above, I find that a conflict of interest did exist, and that each such conflict, upon proper disclosure could have been resolved, and Hulse and Farr ethically employed to represent both interests.

"V

"*Was a disclosure made to the parties having a conflict of interest; and if made, was the disclosure adequate?*

"There is little dispute in the evidence concerning the fact that a disclosure was made to Smiley, who was acting as next friend for her minor son, Michael. While there is conflict in the evidence as to who discovered and first mentioned the conflict, it is clear that there was some discussion between Smiley and Respondents regarding the duality of their representation. I find that a disclosure of Respondents' conflict of interest was made to Smiley and that Smiley, through one means or another, was aware that Respondents were performing legal services for and defending the interests

of Crooks I in other legal proceedings. I further find that there is no evidence of any disclosure of the dual representation made to Crooks I, however, disclosure was made to the Farm Bureau Insurance Company, carriers of the liability insurance on the automobile owned by Crooks II and driven by Crooks I.

"In light of the findings of the existence of a conflict of interest requiring application of Code, Section DR 5-105 and the duty on the part of Respondents to maintain the confidentiality of the disclosures made to them by Michael and Smiley as required by DR 4-101, it now becomes necessary to consider whether or not DR 4-101(C) and DR 5-105(C) have been complied with in order to render ethically acceptable the dual representation here involved, under DR 5-105(B).

"DR 4-101(C)(1) provides that a lawyer may reveal:

" 'confidences or secrets with the consent of the client or clients affected, but only after a full disclosure to them.'

"I am unable to find any evidence that would indicate an informed discussion between Respondents and their clients regarding the significance of a disclosure of their clients' confidences.

"The evidence is silent on the nature or extent to which Respondents may have disclosed their clients' confidences or secrets to the Farm Bureau and/or Crooks I, except with regard to the incident wherein Respondent authorized the Farm Bureau to take a statement from Michael. It does not appear that there was any disclosure made to Smiley or Michael regarding the implications of such a disclosure with the exception of the fact that Respondents told Smiley that it was 'all right' to give a statement and that it further appears that immediately after the giving of the statement the medical payments claim was paid. It does not appear that Respondents ever informed Smiley or Michael that the medical payments could be obtained without giving the statement. Under the circumstances, Smiley might well have inferred

that the giving of the statement by Michael was a condition precedent to the right to obtain the medical payments disbursement, and Smiley so testified. Nothing in the testimony of either Respondent would have disabused her of this impression. With regard to this incident, I find that the disclosure to Smiley and Michael was not adequate.

"The standard of disclosure requires something more than merely telling a client it is 'all right' to give a statement. The client is entitled to know what benefits the disclosure of confidential information may obtain and what detriments may be suffered as a consequence thereof. With regard to the giving of the statement, Respondents encouraged Smiley and Michael to disclose material key to that client's case. They did not discuss the advantages or disadvantages of such disclosure. Mr. Farr, in his testimony, stated that he did not remember whether he had told Smiley that he expected to get the benefit of Farm Bureau's investigation in exchange for the statement. He testified that he 'had it in mind' but did not remember discussing it with Smiley. There was no testimony from either Respondent regarding the disadvantages of the disclosure of such information. Under the circumstances the disclosure must be regarded as inadequate.

"We turn now to the adequacy of the disclosure of the multiple employment and the determination as to whether or not Respondents have satisfied the requirements of DR 5-105(C).

"DR 5-105(C) sets the standards for multiple representation. They are in fact two in number. First,

" 'If it is obvious that he (the lawyer) can adequately represent the interest of each;' and,

Second,

" 'If each (client) consents to the representation after full disclosure of the *possible effect of such representation on the exercise of his independent professional judgment on behalf of each.*' (Emphasis added)

"This Hearing Officer has already determined that 'It is obvious that he (the lawyer) can adequately represent the interest of each. . . .'

"It is likewise undisputed that Smiley consented to the dual representation. The only remaining question is whether or not she did so after an adequate disclosure.

"DR 5-105(C) sets the standard for the adequacy of the disclosure by requiring that the disclosure be of such a nature that it would inform the client 'of the possible effect of such representation on the exercise' of the lawyer's 'independent professional judgment.' The pre-existing Canon of Professional Ethics sets essentially the same standard when it provides:

"  'It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstance of his relationships to the parties and any interest in or connection with the controversy which might influence the client in the selection of counsel.'

The Canons further provide that:

"  'The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.'

"DR 5-105(A) and (B) contemplate that the obligation of the lawyer in the multiple representation situation, not only make disclosure at the inception of the employment (A) but that he has a continuing duty to disclose all subsequent developments in a case which might adversely affect the independence of his professional judgment (B).

"In this case, at its inception, Respondents had no way of knowing that there would be a multiple employment and certainly not a conflict. While there is some dispute concerning when Respondents first knew or could have known of the presence in the case of Farm Bureau as insurer of

Crooks I, it is certainly true that as of March, 1967, the fact was known and discussed with Smiley. The disclosure at this juncture was timely and certainly enabled Smiley to protect the rights of Michael and herself.

"The evidence of disclosure as to Smiley and Michael is reflected in the testimony of the two Respondents, Hulse and Farr, Smiley, Mrs. Bilbrey, and by inference the discussions between Smiley and her two other lawyers Messrs. Dietzen and Eisle. The letter of resignation (Disciplinary Commission Exhibit No. 4.) from Respondents to Smiley also reveals indirectly the nature and extent of the disclosures made.

"In sum, this evidence reveals that Respondents told Smiley that in their opinion Michael could not assemble sufficient evidence to sustain the burden of proof required in a guest case which would require evidence of wilful and wanton misconduct on the part of Crooks I. They also expressed the opinion that, in view of the lack of a guest case, there was no conflict of interest between Michael, Smiley, and Crooks I and that therefore they could, with Smiley's approval, represent both interests. During the progression of the case, Smiley became aware that Respondents were defending Crooks I in several other related actions. It is not clear whether Respondents communicated this fact, or Smiley learned it from other sources. With the exception of Disciplinary Commission Exhibit No. 4, all such communications were oral.

"The direct evidence does not disclose any discussion between Smiley and her attorneys of the *effect of the conflict on the independence of Respondents' professional judgment.*

"On the other hand, Respondents, as shown by the exhibits, made as many as thirty written reports to Farm Bureau in connection with their representation of Crooks I; and these contain several references to telephone conversations between Respondents and Farm Bureau personnel. These reports, while covering matters unrelated to the issues in Michael's case, also analyze and discuss evidence, points of law and related

matters bearing upon Michael's case. If the regular and analytical reporting made to Farm Bureau was appropriate to the informed progression of the Crooks I and Farm Bureau interests, then similar disclosures and analyses should have been made to the Smiley-Michael interests.

"The purpose of the disclosure is to inform the client so that each client to the conflict may make an intelligent decision as to whether they want to continue the employment of a particular lawyer. It is obvious that disclosures to insurance company personnel who are experienced and sophisticated in making the numerous judgmental decisions required in a case of this kind need be far less detailed and analytical than disclosures made to a callow fourteen-year-old youth and his housewife mother. In the latter instance, substantially greater care should be exercised by the attorney to be certain that he has made his uninitiated client comprehend the full implications of the conflict.

"Further there is no evidence that Respondents ever revealed to or discussed with Smiley the possibility of a suit against Crooks II for the negligent entrustment of the Crooks II automobile to Crooks I, a non-licensed driver with a poor driving record and a propensity for intoxicating beverages. There is ample evidence in the record to support a serious consideration of initiating a suit based on this theory. This theory should have been discussed with Smiley.

"It might be argued that it is not unethical for a lawyer to fail to discuss all possible theories of recovery with a client, because some lawyers are more ingenious than others in ferreting out avenues of attack on behalf of their clients. All theories might not occur to all lawyers. With this argument, I agree. It is not a question of ethics but of competence.

"However, in the case at hand, Respondents in their written reports and apparently in their telephone conversations with Farm Bureau personnel, devoted much attention to efforts to remove Crooks II (and later his estate) from suits brought by

the two Lapel Town Marshals (See Disciplinary Commission Exhibit No. 13 and Disciplinary Commission Exhibit No. 22, and the reports dated December 5, 1967 and April 16, 1970). While numerous avenues were explored, Respondent Farr concluded that the evidence was sufficient to overcome of motion for directed verdict and thus present the case to the trier of fact.

"If the negligent entrustment theory was of such quality to warrant this attention in the defense of Crooks II, it likewise warranted disclosure and discussion with Smiley regarding its potential in Michael's case. The argument that Michael's story precludes a guest case recovery, should likewise preclude a negligent entrustment recovery, even though simple negligence is all that must be shown under this theory. This is not the point. Smiley should have been informed and given an opportunity to decide whether to forego such a theory as was done on the guest case theory.

"From the evidence, it is clear that Smiley was not aware at any time of this possibility. It is equally clear that she was not aware of the conflict of interest between herself and Crooks II. Respondents were engaged in defending Crooks II, another one of Farm Bureau's insureds. This conflict should have been disclosed—it was not. Ethical consideration 7-8 (page 351) is illustrative of the conclusion expressed herein.

"'A lawyer should exert his best efforts to insure that decisions of his client are made only after the client has been informed of relevant considerations. A lawyer ought to initiate the decision-making process if the client does not do so. Advice of a lawyer to his client need not be confined to purely legal considerations. A lawyer should advise his client of the possible effect of each legal alternative. A lawyer should bring to bear upon this decision-making process the fullness of his experience as well as his objective viewpoint. In assisting his client to reach a proper decision, it is often desirable for a lawyer to point out those factors which may lead to a decision that is morally just as well as legally permissible. He may emphasize the possibility of harsh consequences that might result from assertion of legally permissible positions. In the

final analysis, however, the lawyer should always remember that the decision whether to forego legally available objectives or methods because of non-legal factors is ultimately for the client and not for himself. In the event that the client in a non-adjudicatory matter insists upon a course of conduct that is contrary to the judgment and advice of the lawyer but not prohibited by Disciplinary Rules, the lawyer may withdraw from the employment.'

"For the foregoing reasons, I find that the disclosures made to Smiley, as the next friend of Michael, were not adequate within the meaning of the Code; DR 5-105(C) and Canon 6. I further find that Respondents have violated Canon 6 Code Section DR 5-105(B) and DR 1-102(A)(1) as charged in Count I of each Verified Complaint for Disciplinary Action.

## "VI

"*Did Respondent Hulse fail zealously to pursue the interests of his clients, Smiley and Michael?*

"The obligation of a lawyer to represent his client zealously is, in one sense, merely a corollary to the Code requirement that the lawyer not represent multiple and conflicting interests. Obviously if the lawyers' independent, objective, professional judgment is adversely affected by conflicting emotions arising from representing multiple and adverse interest, he cannot zealously represent his client. If the conflict is resolved, the lawyer may zealously represent multiple clients.

"From the evidence here presented, I find that Mr. Hulse performed the lawyer duties of investigation, preparation of the case, legal research, pleading and related duties zealously and with professional competence. This conclusion is supported by the testimony of Mr. Howard Young, an attorney of skill and unquestioned integrity, whose testimony included an outline of the preparatory steps he would have taken in this case. The undisputed testimony of Respondents, especially Mr. Hulse, show that they did much the same sort of preparatory work as Mr. Young recommended.

"In the sense that Respondents' disclosure of the conflict

of interest was inadequate and therefore a violation of DR 5-105(B) it might be argued that Respondents were not zealous. I prefer to rest these findings and recommendations upon DR 5-105(B). Therefore, I find that Respondent Hulse has not violated DR 7-101(A) or DR 1-102(A)(1) as charged in Count II of the Verified Complaint for Disciplinary Action in Cause 974 S 196.

## "VII

## "GENERAL AND JURISDICTIONAL FINDINGS OF FACT

"Respondents are and were members of the Anderson, Indiana law firm, Busby, Austin, Cooper & Farr, and as such were duly admitted to practice before the Supreme and Inferior Courts of the State of Indiana.

## "VIII

## "RECOMMENDATIONS

"Having found a violation of Canon 6 and Code Section DR 5-105(B) it is incumbent upon the Supreme Court to consider what, if any, punishment should be imposed upon Respondents.

"In this context, the following findings of fact which this Hearing Officer now makes are pertinent:

"1. Respondents are attorneys of undisputed professional skill, integrity, and whose prior professional conduct is above reproach. All of the attorneys testifying in this case so testified, and their testimony is not disputed in any way by the Disciplinary Commission. Respondent Farr has been a leader in his profession and has served as president of his County Bar Association. One witness testified that Mr. Farr was one of two, or at the most three, leading lawyers in his community.

"2. Respondent Hulse, though newly admitted to practice at the time of his employment by Smiley, displayed tact, compassion, and a high degree of ingenuity in investigating and preparing this case for Smiley and Michael.

"3. Respondents appeared and testified in their own behalf. Their testimony was candid, fair, and appeared to this Hearing Officer to be altogether truthful. Although I cannot agree with some of the legal and ethical conclusions which they sought to draw from their statement of the facts, I do find their factual statements to have been true and their legal analyses and recommendations to their clients to have been fairly arrived at and competently conceived.

"4. Promptly upon learning that Smiley had begun to have 'second thoughts' about the conflict of interest, Respondents withdrew from representation in favor of other counsel chosen by Smiley.

"5. Subsequent to Respondents' withdrawal from representation of Smiley and Michael, substantial recoveries were made on Michael's behalf from Farm Bureau. I find that this recovery resulted in part from the fact that subsequent to Respondents' withdrawal, Crooks I sustained permanent head injuries in a second accident which rendered him incapable of defending himself or his insurer, Farm Bureau; and that because of this change in circumstance, Farm Bureau elected to settle the claim then being made by Smiley.

"6. It is impossible to say now whether or not greater recoveries might have been effected had other counsel represented Smiley and Michael at an earlier time in the proceeding. I find that such contemplation would be pure speculation and that no significant detriment was suffered by Smiley and Michael which can be directly or proximately related to Respondents' violation of Code Section DR 5-105(B).

"7. Respondents have gone to great lengths to disclose to the Disciplinary Commission and this Hearing Officer every reasonably available bit or relevant evidence upon which a fair determination could be made.

"8. The Code Section here relied upon is relatively new and indeed was not enacted at the time Respondents' employment began. The cases decided under the Code are few

and none have been brought to this Hearing Officer's attention nor discovered through research which are instructive on the specifics of what constitutes an adequate disclosure.

"For the foregoing reasons, I recommend that no form of punishment or penalty be imposed upon Respondents."

In accepting the Hearing Officer's findings, we expressly include those that mitigate in favor of his recommendation. In addition to his conclusions, we also conclude that the violations found were the result of the mere failure by Respondents to consider adequately the ethical ramifications of their actions and were not by design for personal gain. The assessment of the appropriate discipline, however, is a judgment upon which reasonable minds may and do differ. But for such mitigating circumstances, we agree that sanctions of considerably greater severity would be mandated. In view of such circumstances, however, we are of the opinion that a public reprimand and payment of the extensive costs herein will suffice for all purposes.

By reason of the foregoing, the Respondents are now censured by this Court and are ordered to appear before it on the 23rd day of February, 1976, at 1:30 p.m. for public reprimand.

It is further ordered that prior to said appearances, the Respondents shall pay to the Clerk of this Court the costs of these proceedings. Failing herein, the Respondents shall be suspended from the practice of law in this state pending the further order of this Court.

Givan, C.J., Arterburn, DeBruler and Hunter, JJ., concur.

NOTE.—Reported at 340 N.E.2d 777.