**Thomas VAN KIRK, Appellant–
Plaintiff,**

v.

**Ward MILLER and More, Miller,
Yates & Tracey, Appellees–
Defendants.**

No. 76A03–0610–CV–499.

Court of Appeals of Indiana.

July 13, 2007.

---

Jon R. Pactor, Indianapolis, IN, Attorney For Appellant.

Cathleen M. Shrader, John M. Clifton, Jr., Barrett & McNagny LLP, Fort Wayne, IN, Attorneys for Appellees.

## OPINION

BAKER, Chief Judge.

Appellant-plaintiff Thomas Van Kirk appeals the trial court's grant of summary judgment in favor of appellees-defendants Ward Miller and the More, Miller, Yates & Tracey law firm (the More law firm) (collectively, the appellees). Specifically, Van Kirk argues that the trial court erred by granting summary judgment because (1) it did not rule on specific portions of the appellees' motion to strike, (2) the conflict of interest between Van Kirk and Miller was nonconsentable or, alternatively, Miller's conflict waiver was inadequate, (3) Miller breached his duty to Van Kirk when he negligently drafted an agreement between Van Kirk and Mark Summers and allegedly favored Summers during the dual representation, and (4) Miller breached his duty to Van Kirk when he continued to represent Summers after Van Kirk had terminated his attorney-client relationship with Miller. Concluding that Van Kirk cannot show that he was prejudiced by the trial court's order regarding the appellees' motion to strike, that the conflict of interest at issue herein was consentable, that Van Kirk knowingly signed a conflict waiver, and that Miller did not breach a duty to Van Kirk, we affirm the trial court's grant of summary judgment in favor of the appellees.

## FACTS

In 1998, Summers purchased the B & T Sports Bar (B & T) in Fort Wayne on contract from Hilda Dill. Summers also purchased the real estate on which B & T was located on contract from Mary Fryback. In October 2002, Summers began experiencing financial difficulties and contacted Miller[1] for financial advice. After analyzing Summers's finances, Miller asked Summers if he would consider selling B & T. Summers expressed an interest to sell the bar and authorized Miller to contact potential buyers. Miller contacted Van Kirk, an experienced businessman[2] who Miller had represented for almost fifteen years. Van Kirk expressed an interest in the B & T deal, and Miller gave him Summers's contact information.

---

1. Miller is an attorney licensed to practice law in Indiana and practices with the More law firm.

2. Coincidentally, B & T had been Van Kirk's first endeavor in the bar industry and the "T" in the bar's name originally stood for "Tom"—a shortened version of Van Kirk's first name. Appellant's App. p. 93, 97.

Van Kirk met with Summers and Summers told him that he owed Fryback $25,000 for the property and owed Dill $35,000 for the bar. Van Kirk offered to pay $30,000 to Dill, $20,000 to Fryback, and $5,000 to Summers, for a total purchase price of $55,000. Summers agreed to accept that offer. Van Kirk later met with Fryback, who verbally agreed to accept $20,000 in exchange for releasing Summers from his obligations on their contract. However, when Van Kirk contacted Dill, she rejected his $30,000 offer.

Nevertheless, Van Kirk told Summers that he wanted Miller to prepare the documents necessary to effect the B & T purchase. Because Miller would be representing both Van Kirk and Summers in the transaction, Miller drafted a Waiver of Conflict of Interest (the conflict waiver). Summers and Van Kirk both signed the conflict waiver on October 22, 2002.

Based on his clients' direction, Miller drafted an Indemnity and Sale Agreement (the agreement), which provided that Summers would sell B & T to Van Kirk for $55,000. At Van Kirk's request, the agreement explicitly provided that the agreement was conditioned on Fryback and Dill releasing Summers from his financial obligations on their contracts:

> Summers has been purchasing the real estate located at 2809 West Main Street from [Fryback], who has agreed to take $20,000.00 at closing in lieu of the greater amount owed her under her real estate purchase contract; the validity of this agreement is contingent upon Fryback agreeing to release Summers of his obligations under that contract and then providing marketable title to Summers to provide to Van Kirk at closing. . . .
>
> All of the shares of [B & T] are presently owned by [Summers], however, they have been pledged to [Dill] as collateral for an obligation owed to her.

> This agreement is expressly conditioned upon the willingness of Dill to release Summers of any continuing obligations to her in exchange for her receipt of $30,000.00 at closing. Summers will then transfer to Van Kirk all of the outstanding shares of [B & T], to which Van Kirk will contribute the land as capital. The transfer is also conditioned upon the acceptability of [Van Kirk], to the Indiana Alcohol and Tobacco Commission, as a shareholder in [B & T].

Appellant's App. p. 14–15. Van Kirk and Summers signed the agreement on October 22, 2002. The closing was scheduled to take place at Miller's office on October 31, 2002, and, in anticipation of the closing, Van Kirk gave Miller $55,000, which Miller placed in an escrow account.

Although Van Kirk and Summers had signed the agreement, their interests soon began to diverge. After the signing, Summers began independently discussing the terms of the agreement with Dill. Dill informed Summers that she did not believe that she was receiving adequate consideration for her interest in B & T and that she would not accept less than $35,000. When Fryback learned that Dill would not accept a discounted amount, Fryback also "changed her mind" and informed Summers that she would "not be giving a discount." *Id.* at 29. Dill told Summers that she would be interested in purchasing his B & T interest and that she would provide him with more than $5,000 "for his trouble." *Id.* at 7.

On the morning of the proposed closing, Summers called Miller to tell him that he "wanted a couple days to think about it." *Id.* at 62. Miller called Van Kirk to see if he would "be interested in putting more money into" the deal, and Van Kirk agreed that he would. *Id.* Miller prepared a revised closing document based on the higher sales price, and Van Kirk arrived at

Miller's office with an additional $7,500 to pay Fryback and Dill in full. However, Miller and Van Kirk were the only two who attended the scheduled closing.

On November 5, 2002, Summers told Miller that he would not complete the transaction with Van Kirk "under any circumstances." *Id.* at 63. Miller met with Van Kirk that same day and returned the money in the escrow account that had been earmarked for the transaction. Van Kirk accepted the money and informed Miller that another attorney, Don Swanson, was now representing him. *Id.* at 106.

Ultimately, Summers sold his interest in B & T to Dill on November 18, 2002, realizing an $11,000 profit. Miller represented Summers at the closing and Dill was represented by independent counsel. Through his new counsel, Van Kirk filed a complaint against Summers, Dill, and Fryback on November 8, 2002, alleging breach of contract. The matter settled approximately nine months later, and Van Kirk's complaint was dismissed with prejudice on September 23, 2003.

█ On October 14, 2004, Van Kirk filed a complaint against the appellees, alleging legal malpractice. The appellees filed a motion for summary judgment on April 21, 2006, and Van Kirk responded to the motion on July 17, 2006.[3] On July 28, 2006, the appellees moved to strike portions of

Van Kirk's designated evidence, specifically, two non-party affidavits and various references to depositions taken in an action in which the appellees were not a party.

The trial court held a hearing on August 11, 2006, and issued an order on August 15, 2006, granting summary judgment in favor of the appellees. The trial court's order provides:

> The Court will not unduly prolong its Order by ruling in detail on each objection lodged by [the appellees] to the evidentiary materials filed with the Court in opposition to [their] Motion for Summary Judgment [ ]. This Court is aware of what evidentiary material can and cannot be considered by a court when ruling upon a Motion for Summary Judgment. All evidentiary materials not filed in a timely manner have not been considered by the Court. All statements set forth in Affidavits which expressly contradict deposition testimony have not been considered by the Court. All materials not admissible into evidence at trial have not been considered by the Court. In reviewing the remaining evidentiary materials properly before the Court for consideration in a light most favorable to the non-moving party the Court finds and Orders as follows:

---

3. In his response to the appellees' motion for summary judgment, Van Kirk argued, in part, that the appellees' designated evidence in support of their motion for summary judgment improperly included a response from the Indiana Disciplinary Commission (Commission) dismissing a complaint that Van Kirk had filed against Miller. Specifically, Van Kirk argued that the Commission's decision not to prosecute Miller was irrelevant and was not binding on Van Kirk's civil litigation. The trial court never specifically addressed Van Kirk's argument, which Van Kirk now argues was erroneous. Appellant's Br. p. 26–28. Indiana Trial Rule 7(B) provides that

"[u]nless made during a hearing or trial … an application to the court for an order shall be made by written motion." Van Kirk's argument was presented to the trial court in his brief responding to the appellees' motion for summary judgment and he never filed a motion to strike or raised the argument at the hearing on the motion for summary judgment. However, even if it was erroneous for the trial court not to issue an order regarding Van Kirk's request to strike the Commission's decision, the trial court did not reference the Commission's decision in its summary judgment order; therefore, Van Kirk cannot show prejudice.

[The trial court lists its findings of fact.]

\* \* \*

## Conclusions of Law

1. To prevail on a negligence claim a party must prove duty, breach of duty, proximate cause and damages.

2. A lawyer certainly at all times has a duty to promote and zealously represent all lawful interests of his clients.

3. The attorney/client relationship existing between Miller and Van Kirk commenced when Miller made the telephone call to Van Kirk advising him that possibly he could purchase a bar business from Summers and concluded when Miller advised Van Kirk the transaction would not be completed and returned to Van Kirk his escrow money on November 5, 2002.

4. Viewing all designated evidentiary materials properly before the Court in support of and in opposition to Miller's Motion for Summary Judgment in a light most favorable to Van Kirk this Court cannot discern from the facts, or reasonable inferences to the drawn therefrom, what duty Miller breached he owed to Van Kirk.

\* \* \*

7. Miller had no control over what Dill would or would not do to assist or hinder the Summers/Van Kirk transaction.

8. Miller had no control over the fact that Summers had independently come to the conclusion that he could make more money by selling the bar business to Dill than fulfilling his contractual obligations with Van Kirk.

9. No evidence exists that Miller sought in any manner to encourage Summers to independently negotiate a new contract with Dill while he (Miller) still had an ongoing attorney/client relationship with Van Kirk.

10. Miller stood ready and able at all times to assist Summers and Van Kirk in closing their business transaction on October 31, 2002 at 3:00 p.m.

11. Miller did not breach any professional duty owed to Van Kirk as a result of his simultaneous attorney/client relationship with Summers under the Code of Professional Responsibility because both Van Kirk and Summers executed a Waiver of Conflict of Interest thereby consenting to Millers [sic] dual representation.

12. There exists no genuine issue of material fact in this case. The law is with Miller and against Van Kirk.

Appellant's App. p. 8–10.

On September 12, 2006, Van Kirk filed a motion to correct error, arguing that the trial court had erroneously found that Miller did not breach his duty and that the trial court should have ruled on the specific requests in the appellees' motion to strike. The trial court denied Van Kirk's motion to correct error on September 23, 2006. Van Kirk now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

Summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Am. Home Assurance Co. v. Allen*, 814 N.E.2d 662, 666 (Ind.Ct.App.2004). A party seeking summary judgment bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. *Tack's Steel Corp. v. ARC Constr. Co., Inc.*, 821 N.E.2d 883, 888 (Ind. Ct.App.2005). A factual issue is "genuine"

if it is not capable of being conclusively foreclosed by reference to undisputed facts. *Am. Mgmt., Inc. v. MIF Realty, L.P.,* 666 N.E.2d 424, 428 (Ind.Ct.App. 1996). Although there may be genuine disputes over certain facts, a fact is "material" when its existence facilitates the resolution of an issue in the case. *Id.*

When we review a trial court's entry of summary judgment, we are bound by the same standard that binds the trial court. *Id.* We may not look beyond the evidence that the parties specifically designated for the motion for summary judgment in the trial court. *Best Homes, Inc. v. Rainwater,* 714 N.E.2d 702, 705 (Ind.Ct.App.1999). We must accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the nonmovant, and resolve all doubts against the moving party. *Shambaugh & Son, Inc. v. Carlisle,* 763 N.E.2d 459, 461 (Ind.2002). On appeal, the trial court's order granting or denying a motion for summary judgment is cloaked with a presumption of validity. *Sizemore v. Erie Ins. Exch.,* 789 N.E.2d 1037, 1038 (Ind.Ct.App.2003). A party appealing from an order granting summary judgment has the burden of persuading us that the decision was erroneous. *Id.* at 1038–39.

A grant of summary judgment may be affirmed upon any theory supported by the designated evidence. *Bernstein v. Glavin,* 725 N.E.2d 455, 458 (Ind.Ct.App.2000). While the trial court here entered specific findings of fact and conclusions of law in its order granting summary judgment for the appellees, such findings and conclusions are not required and, while they offer valuable insight into the rationale for the judgment and facilitate our review, we are not limited to reviewing the trial court's reasons for granting or denying summary judgment. *Id.*

## II. The Appellees' Motion to Strike

■ Van Kirk first argues that it was error for the trial court not to address specific portions of the appellees' motion to strike. Specifically, Van Kirk attacks the trial court's "generic comments" and argues that he "has to presume that [the trial court] did not grant the motion." Appellant's Br. p. 11–12.

When ruling on the appellees' motion to strike portions of Van Kirk's designated evidence, the trial court provided:

> All evidentiary materials not filed in a timely manner have not been considered by the Court. All statements set forth in Affidavits which expressly contradict deposition testimony have not been considered by the Court. All materials not admissible into evidence at trial have not been considered by the Court.

Appellant's App. p. 8.

On appeal, Van Kirk does not take issue with the trial court's legal conclusions but, instead, argues that the order's ambiguity leads him to conclude that the trial court did not grant the appellees' motion to strike. We cannot agree. The thrust of the trial court's ruling is that it agreed with the appellees' arguments but that it would "not unduly prolong its Order by ruling in detail on each objection lodged by [the appellees]." *Id.* Instead, the trial court announced the categories of evidence it would not consider—e.g., evidence that was untimely, inadmissible, or contradictory to deposition testimony. While we agree with Van Kirk that the trial court could have made its ruling clearer, we do not find its imprecision to be reversible error.

## III. Legal Malpractice

■ "Under Indiana law, the elements of legal malpractice are: (1) employment of an attorney, which creates a duty to the client; (2) failure of the attorney to exercise ordinary skill and knowl-

edge (breach of the duty); and (3) that such negligence was the proximate cause of (4) damage to the plaintiff." *Clary v. Lite Mach. Corp.*, 850 N.E.2d 423, 430 (Ind.Ct.App.2006) (citing *Rice v. Strunk*, 670 N.E.2d 1280, 1283–84 (Ind.1996)). As long as the appellees negate at least one element of Van Kirk's legal malpractice claim, the trial court's grant of summary judgment will be upheld. *Legacy Healthcare, Inc. v. Barnes & Thornburg*, 837 N.E.2d 619, 624 (Ind.Ct.App.2005), *trans. denied.*

### A. The Conflict Waiver

The parties agree that Miller's dual representation of Summers and Van Kirk resulted in a concurrent conflict of interest that triggered Indiana Professional Conduct Rule 1.7.[4] However, the parties disagree about whether that conflict was consentable or nonconsentable and whether Van Kirk gave informed consent when he signed the conflict waiver.

### 1. Consentable and Nonconsentable Conflicts

Given the scarcity of relevant Indiana case law concerning the waiver of concurrent conflicts of interest, Professional Conduct Rule 1.7 and its commentary provide valuable insight. Rule 1.7(b) provides that a concurrent conflict can be waived by informed, written consent if an attorney reasonably believes that he will be able to provide competent and diligent representation to the affected clients, the representation is not prohibited by law,[5] and the clients' interests are not directly adverse to each other in litigation that is before a tribunal. If the conflict falls within one of these three categories, it is deemed "nonconsentable" and cannot be waived. Prof. Cond. R. 1.7 cmt. 14. "Whether a conflict is consentable depends on the circumstances" and "common representation is permissible where the clients are generally aligned in interest even though there is some difference in interest among them." *Id.* at cmt. 28.

First, Van Kirk argues that the conflicts at issue herein were nonconsentable because "[a] law firm cannot represent both a seller and the buyer in the same transaction." Appellant's Br. p. 16. As

**4.** Indiana Professional Conduct Rule 1.7 provides that

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

**5.** The comments provide examples of situations where multiple representations are prohibited by law: "some states['] substantive law provides that the same lawyer may not represent more than one defendant in a capital case, even with the consent of the clients...: In addition, decisional law in some states limits the ability of a governmental client, such as a municipality, to consent to a conflict of interest." Prof. Cond. R. 1.7 cmt. 16.

support for that proposition, Van Kirk directs us to various attorney discipline actions where our Supreme Court has reprimanded attorneys who represented clients with competing interests. *See Matter of Moores,* 854 N.E.2d 350 (Ind.2006) (disciplining an attorney who concurrently represented two landowners with competing interests in a foreclosure action and did not obtain a conflict waiver); *Matter of Heppenheimer,* 705 N.E.2d 996 (Ind.1999) (disciplining an attorney who represented the buyer in a transaction where his partner represented the seller, the buyer did not consent to the dual representation, and the attorney commingled the clients' funds in violation of Professional Conduct Rule 1.15). Additionally, Van Kirk directs argues that it is "well settled that there are certain disputes or conflicts of interest which are so adverse that an attorney simply may not under any circumstances represent both parties to the conflict." *Matter of Farr,* 264 Ind. 153, 160, 340 N.E.2d 777, 782 (Ind.1976) (holding that it was improper for a law firm to represent both the victim of a vehicle accident in civil litigation and the driver charged with reckless homicide in criminal litigation without adequately disclosing the representation to both parties).

However, the cases to which Van Kirk directs our attention are readily distinguishable from the facts of the case herein. First, Miller had been representing Summers when Summers gave him permission to contact potential B & T buyers. Miller contacted Van Kirk, his client in unrelated matters, and gave Van Kirk Summers's contact information when Van Kirk expressed an interest in the B & T sale. After independently negotiating with Summers and deciding to purchase B & T, *Van Kirk* decided that Miller should represent both he and Summers in the transaction because it would "save money." Appellant's App. p. 28. As Van Kirk admitted in his deposition, after negotiating with Summers, he "knew that there would have to be a closing and Mr. Miller would, you know, handle the written agreements and whatever legal documents needed to be done." *Id.* at 101, 340 N.E.2d 777.

Although Van Kirk argues that the conflict at issue herein was nonconsentable, we find his arguments to be unpersuasive. First, Van Kirk and Summers, while clearly protecting their own self-interests, had a common goal—the finalization of the B & T transaction. And, as noted above, Rule 1.7 provides that dual representation is permissible where the clients' interests are "generally aligned ... even though there [are] some difference[s]." Prof. Cond. R. 1.7 cmt. 28.

Furthermore, Summers and Van Kirk independently negotiated [6] the terms of the transaction and contacted Miller to draft an agreement that would finalize the deal. Miller did not sit on both sides of the table during the negotiations and, instead, was employed to draft the agreement memorializing the terms that Summers and Van Kirk had independently negotiated. In sum, it was reasonable for Miller to conclude that he could competently and diligently draft an agreement for the parties; therefore, we conclude that the conflict at issue herein was con-

---

6. We pause to note that the Rule 1.7 commentary cautions an attorney from representing multiple clients where "contentious litigation or *negotiations* between them are imminent or contemplated." Prof. Cond. R. 1.7 cmt. 29 (emphasis added). Therefore, while a transaction may still sour after the parties have negotiated the basic terms of the agreement—as illustrated by the facts of the case herein—an attorney is less likely to be placed in a contentious situation if the relationship between the parties is not inherently antagonistic.

sentable. For that reason, it was permissible for Miller to represent both Summers and Van Kirk if he obtained a valid conflict waiver for the dual representation.

### 2. Validity of the Conflict Waiver

The commentary following Rule 1.7 elaborates on the informed consent clients are required to give to waive a concurrent conflict. Informed consent requires that "each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interest of that client." Prof. Cond. R. 1.7 cmt. 18. Informed consent must be confirmed in writing "to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing." *Id.*

While there is little civil case law detailing what constitutes an informed conflict waiver, our Supreme Court has held that in the criminal context, where a defendant has a Sixth Amendment right to counsel and various constitutional liberties may be at issue, a "defendant's [conflict] waiver should be presumed valid, and the burden . . . is on the defendant to prove otherwise. If there is evidence supporting the conclusion of an uninformed, or worse, improperly influenced waiver, the [ ] court must assess the defendant's appreciation of the risks." *Latta v. State*, 743 N.E.2d 1121, 1131 (Ind.2001).

■ Van Kirk argues that his conflict waiver was invalid because he did not knowingly give informed consent for the dual representation. In essence, Van Kirk argues that the conflict waiver Miller prepared was ineffective as a matter of law or, alternatively, that it involves genuine issues of material fact that preclude summary judgment. The conflict waiver, which Van Kirk signed on October 22, 2002, provided that

[Van Kirk and Summers] have each been represented over some time by attorney [Miller] and each well understands that a conflict of interest would preclude Miller, or those who practice with him, from fully representing the interests of one against the other in the contemplated sale of [B & T] stock and the land at 2809 West Main Street, Fort Wayne, Indiana.

The terms of the proposed sale have been largely negotiated by the parties without the intervention of attorney Miller, and each of us hereby waives the conflict of interest which would otherwise preclude attorney Miller from representing either of us in the preparation of a proposed sale and closing documents. We understand the conflict which could arise; we understand we have the right to demand that attorney Miller turn the files for this transaction over to independent counsel of our own choice, without any such conflicts; and we freely agree to permit him to represent both of us in the proposed preparation of documents and closing.

Appellant's App. p. 33.

While Van Kirk baldly asserts that he did not knowingly waive the conflict, he fails to articulate what he did not understand when he signed the waiver, and he does not assert that Miller improperly influenced him to sign it. Aside from Van Kirk's cursory argument that Miller could have taken more time to explain the waiver, he fails to direct us to evidence supporting his contention that he was not fully informed when he signed the waiver. Instead, the plain language of the conflict waiver states that Van Kirk and Summers had negotiated the terms of the sale and that Miller was being employed to "prepar[e the] proposed sale and closing docu-

ments." *Id.* The waiver provides that the parties had the right to independent counsel and that Miller would release the B & T transaction files to such counsel if Van Kirk or Summers desired. In short, the plain language of the conflict waiver adequately informed Van Kirk that by signing the waiver he was consenting to Miller's dual representation. Because Van Kirk fails to explain what he did not understand when he signed the waiver, we do not find a genuine issue of material fact that undermines the trial court's conclusion that the conflict waiver was valid.

Additionally, Van Kirk attempts to connect his argument regarding Miller's alleged negligent representation to the conflict waiver issue by contending that "[a] waiver of the dual representation is not a waiver of liability for future malpractice." Appellant's Br. p. 21. However, by holding that Van Kirk knowingly signed the conflict waiver, we are *not* holding that he was not entitled to competent, diligent representation. *See* Prof. Cond. R. 1.7(b), cmt. 15 (providing that a nonconsentable conflict occurs if a lawyer does not reasonably believe that he will be able to provide competent, diligent representation to each client). Put another way, even though Van Kirk knowingly consented to the dual representation by signing the conflict waiver, Miller's alleged legal malpractice is a separate issue, which will be addressed momentarily. In sum, because we have concluded that the concurrent conflict of interest at issue was consentable and Van Kirk fails to present evidence that his conflict waiver was uninformed or improperly influenced, we agree with the trial court that the conflict waiver was valid.

### B. Miller's Alleged Breach of Duty

■ In order to succeed in a legal malpractice claim, the plaintiff must prove, among other things, that the attorney breached his duty to the client. *Clary*, 850 N.E.2d at 430. In Indiana, an attorney is generally required "to exercise ordinary skill and knowledge." *Rice*, 670 N.E.2d at 1283–84. While both parties agree that Miller owed a duty to Van Kirk, Van Kirk asserts that Miller breached his duty because he allegedly favored Summers during the dual representation and continued to represent Summers after Van Kirk terminated the attorney-client relationship.

Because we are mindful that summary judgment is improper if there are questions of material fact that a jury must decide, we emphasize that the material facts of this case are not in dispute. Miller was representing Summers when he contacted Van Kirk to see if he would be interested in purchasing B & T. Summers and Van Kirk independently negotiated the terms of the deal. Summers and Van Kirk signed a conflict waiver and employed Miller to represent them in "the preparation of a proposed sale and closing documents," appellant's app. p. 33. Miller drafted the agreement, and Van Kirk and Summers signed the agreement on October 22, 2002. Summers independently talked to Dill and, eventually, withdrew from the agreement with Van Kirk. Miller informed Van Kirk on November 5, 2002, that Summers had withdrawn, Van Kirk terminated his attorney-client relationship with Miller on that date, and Miller represented Summers in the B & T closing with Dill on November 18, 2002. While the parties disagree regarding the legal conclusions that can be drawn from these facts—e.g., the validity of the conflict waiver that Van Kirk signed or whether Miller's actions during and after his representation of Van Kirk constituted legal malpractice—those conclusions are questions of law.

■ Van Kirk argues[7] that Miller breached his duty to Van Kirk when he "gave [Dill and Fryback,] who were not parties to the contract, a veto over the purchase." Appellant's Br. p. 14. Van Kirk's argument references the contingency provisions of the agreement, which provided that

> the validity of this agreement is contingent upon Fryback agreeing to release Summers of his obligations under that contract and then providing marketable title to Summers to provide to Van Kirk at closing. . . .
>
> This agreement is expressly conditioned upon the willingness of Dill to release Summers of any continuing obligations to her. . . .

Appellant's App. p. 14–15. However, Van Kirk admitted in his deposition that he requested the contingency provisions to be in the agreement so that he would be "protected." Id. at 102. Although Van Kirk now complains about the contingency provisions, Miller included it in the agreement *at Van Kirk's request* to protect Van Kirk. In fact, before allowing Van Kirk to sign the agreement, Miller discussed the agreement with him and went "through the highlights of the document with him to reflect that the conditions that he wanted put in there, in fact were put in there." *Id.* at 56. Therefore, we cannot find that Miller breached his duty to Van Kirk simply because he included a provision in the agreement that Van Kirk had requested for his own protection. Although Van Kirk now believes that the contingency provisions gave Dill and Fryback an unintended "veto power" over the B & T deal, appellant's br. p. 14, it was not a breach of

duty for Miller to include those provisions in the agreement per Van Kirk's request.

■ While Van Kirk argues that Miller favored Summers during the dual representation, the evidence does not support that contention. As previously noted, Miller drafted the agreement to include provisions that specifically protected Van Kirk. He also drafted a revised closing document on the date of the anticipated closing that included the higher amounts that Van Kirk was willing to pay. But, as Miller correctly observed, he "had no way to compel" the other parties to agree to the terms of the closing, appellant's app. p. 62, and the evidence shows that Summers and Dill, not Miller, were responsible for Van Kirk being removed from the final deal. While we are cognizant of Miller's duty to Van Kirk, Van Kirk fails to cite evidence that leads to the conclusion that Miller failed to represent him competently and diligently as his attorney.

■ Van Kirk also argues that Miller breached his duty when he represented Summers in the B & T transaction with Dill after Van Kirk had ended his attorney-client relationship with Miller on November 5, 2002. We are unable to find relevant case law on point with the facts of this case—i.e., case law that discusses the propriety of an attorney continuing to represent a client involved in dual representation where the other client has terminated the relationship—however, commentary to Rule 1.7 provides:

> A client who has given consent to a conflict may revoke the consent and, like any other client, may terminate the lawyer's representation at any time. Whether revoking consent to the client's own representation precludes the lawyer

---

7. Van Kirk initially argues that Miller committed legal malpractice by representing both Van Kirk and Summers in the B & T transaction. Appellant's Br. p. 13. However, because we have already held that Miller's dual representation was not improper based on the facts of this case, we need not address Van Kirk's argument further.

from continuing to represent other clients depends on the circumstances, including the nature of the conflict, whether the client revoked consent because of a material change in circumstances, the reasonable expectations of the other client and whether material detriment to the other clients or the lawyer would result.

Prof. Cond. R. 1.7 cmt. 21.

The gravamen of Van Kirk's argument is that it was improper for Miller to continue to represent Summers in the B & T transaction because Van Kirk terminated his relationship with Miller on November 5, 2002. However, we agree with the cited commentary that the propriety of such representation is based on the circumstances of the case and the nature of the conflict. Here, there is no evidence that Van Kirk's termination of the attorney-client relationship with Miller also revoked the conflict waiver that he had previously signed. In fact, Van Kirk provides no evidence that he told Miller not to continue to represent Summers in the B & T transaction. Instead, Miller testified that he "presumed from [Van Kirk's] lack of demand that [Miller] walk away from [the closing with Summers and Dill] that [Van Kirk] acquiesced in it." Appellant's App. p. 67.

We conclude that Miller's decision to represent Summers after Van Kirk had terminated his attorney-client relationship was not improper. We emphasize the transactional nature of the dual representation in this case and again note that Van Kirk and Summers employed Miller to represent them in "the preparation of a proposed sale and closing documents" in the B & T transaction. *Id.* at 33. While it is unfortunate that Summers and Van Kirk did not successfully close on the B & T deal as originally intended, it does not automatically follow that Miller committed legal malpractice because the anticipated deal collapsed. There is no evidence that Miller favored Summers during the dual representation and there is no evidence that Van Kirk told Miller to stop representing Summers after Van Kirk terminated Miller's representation.[8] In sum, we cannot conclude that Miller breached his duty to Van Kirk and, therefore, we cannot conclude that Miller committed legal malpractice.[9] Consequently, it was not improper for the trial court to grant summary judgment in favor the appellees.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and CRONE, J., concur.

---

**8.** We acknowledge that Indiana Professional Conduct Rule 1.9 establishes that attorneys have a duty to former clients; however, the parties do not discuss the impact of Rule 1.9 on the facts of this case and we decline to develop those arguments for them.

**9.** Because we conclude that the appellees have negated the breach of duty element of Van Kirk's legal malpractice claim, we need not address the proximate cause or damages elements of the tort. *Legacy Healthcare,* 837 N.E.2d at 624.